IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 13-16684

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*

Appellants,

v.

UNITED STATES FOREST SERVICE,

Appellee.

## APPELLANTS CENTER FOR BIOLOGICAL DIVERSITY, *et al.*'s OPENING BRIEF

APPEAL FROM JULY 2, 2013 DECISION AND ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

Kevin M. Cassidy (OSB 025296)
Allison LaPlante (OSB 023614)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
T: (781) 659-1696 (Cassidy)
T: (503) 768-6894 (LaPlante)
F: (503) 768-6642
E: cassidy@lclark.edu
E: laplante@lclark.edu

Attorneys for Appellants

Adam Keats (CSB 191157)
Center for Biological Diversity
357 California St., Suite 600
San Francisco, CA 94104
T: (415) 436-9682 x 304
E: akeats@biologicaldiversity.org

Attorney for Appellants

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26(1), Appellants Center for Biological Diversity, Sierra Club, and Grand Canyon Wildlands Council submit the following Corporate Disclosure Statements.

Appellant Center for Biological Diversity is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Appellant Sierra Club is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Appellant Grand Canyon Wildlands Council is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

Dated this 26th day of November, 2013.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ............................................................................... iv

Jurisdictional Statement .......................................................................... 1

Statement of the Issue ............................................................................ 2

Statement Regarding Addendum .............................................................. 3

Statement of the Case ............................................................................. 3

Statement of Facts .................................................................................. 5

I.      Spent Lead Ammunition and the Kaibab National Forest .............. 5

II.     Forest Service Authority To Stop the Endangerment ................... 10

III.    RCRA's Imminent and Substantial Endangerment Provision ...................... 12

Legal Standards ..................................................................................... 14

Summary of the Argument ..................................................................... 17

Argument .............................................................................................. 21

I.      The Center Sufficiently Alleged Injury-In-Fact ........................... 23

II.     The Center Sufficiently Alleged Causation ................................. 24

III.    The Center Sufficiently Alleged Redressability .......................... 28

        A.      The Court Can Redress the Center's Injuries By Ordering the Forest
                Service To Stop the Endangerment ................................. 29

        B.      *Norton v. Southern Utah Wilderness Alliance* Does
                Not Apply ..................................................................... 35

C. Any Uncertainty Associated with the Process of Complying with a Court Order To Stop the Endangerment Does Not Defeat Redressability ................................................................... 39

D. Reduction of a Known Risk Satisfies Redressability .................... 46

Conclusion ...................................................................................... 51

Statement Regarding Related Cases ....................................................... 52

Certificate of Compliance ..................................................................... 53

Certificate of Service .......................................................................... 54

Addendum

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994) ............ 32, 33, 34

*Allen v. Wright*, 468 U.S. 737 (1984) ..................................................... 14

*Animal Legal Def. Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) ................... 44

*Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912 (9th Cir. 2001) ............ 1

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................... 38

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) ........................................... 39

*Bernhardt v. Cnty. of L.A.*, 279 F.3d 862 (9th Cir. 2002) ................................ 45

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002) ................. 29

*BP Exploration & Oil, Inc. v. EPA*, 66 F.3d 784 (6th Cir. 1995) ......................... 42

*Brem-Air Disposal v. Cohen*, 156 F.3d 1002 (9th Cir. 1998) .............................. 38

*Comm. for Full Emp't v. Blumenthal*, 606 F.2d 1062 (D.C. Cir. 1979) ..............17

*Cmty. Nutrition Inst. v. Block*, 698 F.2d 1329 (D.C. Cir. 1983) ........................ 43

*Competitive Enterprise Inst. v. Nat'l Highway Traffic Safety Admin.*, 901  F.2d 107 (D.C. Cir. 1990) ..................................................... 43

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) ................. 47

*Covington v. Jefferson Cnty.*, 358 F.3d 626 (9th Cir. 2004) ............................. 26

*Cox v. City of Dallas*, No. 3:98–cv–0291–H, 1999 WL 3376551 (N.D. Tex. 1999) ........................................................................... 32

*Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012 (D.C. Cir. 1997) ...... 14

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141
    (9th Cir. 2000) ........................................................................ 24, 25

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149
    (4th Cir. 2000) ................................................................................. 29

*Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391 (9th Cir. 1992) ............................ 24

*Gonzales v. Gorsuch*, 688 F.2d 1263 (9th Cir. 1982) ................................... 28, 32

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) .......................................... 22

*Hunt v. U.S.*, 278 U.S. 96 (1928) ......................................................... 25

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005) ......... 32

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795
    (D.C. Cir. 1983) ............................................................................. 32

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) .................................... 10, 25

*K-V Pharm. Co. v. U.S. Food & Drug Admin.*,
    889 F.Supp.2d 119 (D.D.C. 2012) ...................................................... 37

*Legal Aid Soc'y of Alameda County v. Brennan*, 608 F.2d 1319
    (9th Cir. 1979) ................................................................................. 16

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
    148 F.3d 1231 (11th Cir. 1998) ...................................................... 34, 44

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ...................... 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................. *passim*

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ................................. 16

*Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006) ....... 13

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ......................................... 41

*Meghrig v. KFC W., Inc.*, 516 U.S. 479 (1996) ....................................... 31

*Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743 (2010)........................... 46

*Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir. 1983)....................................... 17

*Native Vill. of Kivalina v. Exxon Mobil Corp.*, 696 F.3d 849 (9th Cir. 2012)....... 15

*Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930
  (D.C. Cir. 2004)....................................................................... 27

*Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) ............................... 42

*Natural Res. Def. Council v. EPA*, 542 F.3d 1235 (9th Cir. 2008) ................ *passim*

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004)............... *passim*

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668
  (9th Cir. 2007) .......................................................... 33, 34, 35

*Oregon v. Legal Serv. Corp.*, 552 F.3d 965 (9th Cir. 2009)................................. 16

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn
  Terminals, Inc.*, 913 F.2d 64 (3d Cir. 1990)................................................. 47

*Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008)... 44

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)............................ 14

*State of N.Y. v. Thomas*, 613 F.Supp. 1472 (D.D.C. 1985) ................................... 15

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ................................ 25

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ................................................. 34

*Thomas v. Mundell*, 572 F.3d 756 (9th Cir. 2009) ............................................. 48

*Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir. 2000) ................................................ 44

*United Mine Workers of America, Int'l Union v. Dye*, No. 06–1053 (JDB), 2006 WL 2460717 (D.D.C. 2006)..................................................... 38

*United States v. Alisal Water Corp.*, 431 F.3d 643 (9th Cir. 2005)........................ 34

*United States v. Price*, 688 F.2d 204 (3d Cir. 1982) ...................................... 13, 30

*Valentini v. Shinseki*, 860 F.Supp.2d 1079 (C.D. Cal. 2012) ............................ 38

*Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328 (7th Cir. 1993)............................ 47

*Warth v. Seldin*, 422 U.S. 490 (1975).................................................................. 16, 48

*W. Ctr. for Journalism v. Cederquist*, 235 F.3d 1153 (9th Cir. 2000)................... 16

## Statutes                  Page(s)

5 U.S.C. § 704................................................................................................ 37

5 U.S.C. § 706(1) .......................................................................................... 36

16 U.S.C. § 1609(a) ...................................................................................... 10

16 U.S.C. § 1651(a) ...................................................................................... 38

28 U.S.C. § 1291........................................................................................... 1, 2

28 U.S.C. § 1331........................................................................................... 1

42 U.S.C. § 6901(b) ...................................................................................... 12

42 U.S.C. § 6972(a) ...................................................................................... *passim*

42 U.S.C. § 6972(a)(1)(B) ............................................................................ *passim*

42 U.S.C. § 6973........................................................................................... 13

**Regulations**                                                           **Page(s)**

36 C.F.R. §§ 251.50-251.65 ................................................................. 11

36 C.F.R. § 261.50 ............................................................................... 39

36 C.F.R. § 261.50(a) ...................................................................... 11, 39

36 C.F.R. § 261.58(m) ......................................................................... 39

36 C.F.R. § 261.58(v) ........................................................................... 39

36 C.F.R. § 261.70 ............................................................................... 39

36 C.F.R. § 261.70(a)(4) ...................................................................... 11


**Other**                                                                 **Page(s)**

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 2

Fed. R. Civ. P. 12(b)(1) .......................................................................... 4

Fed. R. Civ. P. 12(b)(6) .......................................................................... 5

Fed. R. Civ. P. 56(e) ............................................................................. 16

51 Fed. Reg. 42,103 (Nov. 21, 1986) ..................................................... 6

75 Fed. Reg. 75,153 (Dec. 2, 2010) ....................................................... 6

Senate Comm. on Env't and Pub. Works, Solid Waste Disposal Act
    Amendments of 1983, S. Rep. No. 98-284 (1983) ........................... 13

Senate Debate, Cong. Rec. S9151 (July 25, 1984) ................................ 13

H.R. REP. NO. 98–198, pt. 1 (1984) ..................................................... 14

H.R. Committee Print No. 96–IFC 31 (1979) ....................................... 13

U.S. CONST., art. IV, § 3, cl. 2 ............................................................... 10

**JURISDICTIONAL STATEMENT**

Plaintiffs-Appellants Center for Biological Diversity, Sierra Club, and Grand Canyon Wildlands Council (collectively "the Center") appeal the district court's decision in *Center for Biological Diversity v. U.S. Forest Service,* No. CV–12–8176–PCT–SMM, 2013 WL 3335234 (D. Ariz. July 2, 2013), dismissing the Center's Resource Conservation and Recovery Act ("RCRA") citizen enforcement suit for lack of standing. The Center's case alleged endangerment to wildlife caused by exposure to spent lead ammunition. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 6972(a), which requires RCRA citizen enforcement suits to be brought in the district court for the district in which the endangerment may occur. The alleged endangerment has occurred and is occurring on the Kaibab National Forest ("the Kaibab"), which is located entirely within the State of Arizona.

On July 2, 2013, the district court issued its Memorandum of Decision and Order dismissing the Center's case. ER at 2–9.[1] That Order is a final appealable order. *See Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 923 (9th Cir. 2001) (noting that a motion to dismiss becomes a final appealable order within the meaning of 28 U.S.C. § 1291 when the district court order disposes of all

---

[1] Documents provided in the Excerpts of Record are cited as "ER at [page number]." All ER page numbers are located in the lower right corner of each page (ranging from 1 to 186).

claims against all parties). On July 2, 2013, the district court also docketed its Judgment in the case based on its order of that same day. ER at 1. This Court has jurisdiction over the Center's appeal from that final order pursuant to 28 U.S.C. § 1291. On August 21, 2013, the Center timely filed its Notice of Appeal from that Judgment disposing of all parties' claims. Fed. R. App. P. 4(a)(1)(B); *see also* ER at 10–12. The Center raised each issue presented on appeal when it responded to the Forest Service's Motion to Dismiss below. *See* Dkt. 62 at 1–11. The district court ruled on each issue in its order granting the Forest Service's Motion to Dismiss. *See* ER at 2–9.

## STATEMENT OF THE ISSUE

1.     Whether the district court erred in dismissing the Center's complaint for lack of Article III standing. Specifically:

       a.     Whether the district court erred by finding that the court did not have the authority to order the Forest Service to abate a known endangerment to wildlife occurring on the Kaibab National Forest;

       b.     Whether the district court erred by finding that even if it had the requisite authority, redressability was still speculative because rulemaking may be required; and

       c.     Whether the district court erred in finding that even if it granted the relief the Center sought, redressability was still speculative because such relief

would not completely redress the Center's every injury.

## STATEMENT REGARDING ADDENDUM

Pursuant to Circuit Rule 28-2.7, an addendum at the end of this brief includes the pertinent statutory provision necessary for the court's determination of the issues presented.

## STATEMENT OF THE CASE

This is a citizen enforcement suit for declaratory and injunctive relief brought under RCRA, arising from the United States Forest Service's ("the Forest Service") contribution to an ongoing endangerment to the environment in northern Arizona. On September 5, 2012, the Center initiated this suit alleging that the Forest Service, through its authority and control over the Kaibab National Forest and the activities that occur there, has contributed and is contributing to the past or present disposal of solid or hazardous waste, which may present an imminent and substantial endangerment to health or the environment, in violation of 42 U.S.C. § 6972(a)(1)(B). The Forest Service is contributing to this endangerment by failing to stop the regular disposal of lead in the form of spent ammunition within the Kaibab and by issuing Special Use permits for guiding and outfitting activities that do not prohibit the use of lead ammunition within the Kaibab.

On December 14, 2012, the Forest Service filed a motion to dismiss, claiming the Center had failed to establish Article III standing and failed to plead

sufficient facts to state a claim for relief.  *See* Dkt. 46 (Forest Service's Motion to Dismiss).  On July 2, 2013, the district court issued its Memorandum of Decision and Order granting the Forest Service's motion to dismiss for lack of Article III standing pursuant to Fed. R. Civ. P. 12(b)(1) and denying as moot several motions to intervene.[2]  ER at 2–9.  The court found that the Center satisfied the injury and causation elements of Article III standing, ER at 5–7, but failed to satisfy the redressability element.  ER at 7–8.  The district court concluded that the Center's injuries were not redressable because it found that the Center sought to compel the Forest Service to perform a discretionary duty, which the court believed was precluded by *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55 (2004). ER at 7.  The court also concluded that, even if it could compel the Forest Service to perform a discretionary duty, it was "speculative" that the Center's injuries would be redressed.  ER at 7–8.  Finally, the court found that even if it were to order the Forest Service to ban the use of lead ammunition in the Kaibab, redressability would remain speculative because one species, California condors, could still be exposed to lead outside of the Kaibab.  ER at 8.  Because the district court concluded that it lacked jurisdiction over the suit, it did not rule on the Forest Service's alternative motion to dismiss for failure to state a claim pursuant to Fed.

_____

[2] The State of Arizona (Dkts. 21 and 22), the National Rifle Association of America and Safari Club International (Dkt. 28), and the National Shooting Sports Foundation, Inc. (Dkt. 54) filed motions to intervene.

R. Civ. P. 12(b)(6).

On July 2, 2013, the district court issued a Judgment in the case based on its Memorandum of Decision and Order, disposing of all parties' claims. ER at 1.

## STATEMENT OF FACTS

## I.    Spent Lead Ammunition and the Kaibab National Forest

Every year, wildlife species that call the Kaibab National Forest home, or otherwise rely on it as important habitat, are needlessly poisoned and killed from exposure to spent lead ammunition. The Forest Service's failure to stop the disposal of spent lead ammunition on the Kaibab is causing and contributing to this preventable death and suffering. As noted in the Complaint, lead is a potent, potentially deadly toxin, exposure to which can cause all animals to suffer numerous and severe adverse health effects, including mortality. ER at 151. It also is the primary material in many forms of ammunition, including bullets used for big game hunting. *Id*. Wildlife species are exposed to spent lead ammunition when they consume animals that have been shot but not retrieved or when they feed on the remains of field-dressed animals (also known as "gut piles") that have been killed with lead ammunition. ER at 151–52.

The risk of poisoning and mortality posed to many species of wildlife by spent lead ammunition is well established. ER at 158–59. Lead poisoning of waterfowl and bald eagles prompted the federal government, in 1976, to begin

instituting a nationwide prohibition on the use of lead ammunition for hunting waterfowl. *See* 51 Fed. Reg. 42,103 (Nov. 21, 1986) (final rule fully implementing establishment of nontoxic shot zones begun in 1976 and culminating in 1991 with nationwide ban); *see also* ER at 152–53. The federal government has issued additional regulations prohibiting the use of lead ammunition in other hunting contexts, such as depredation. *See, e.g.*, 75 Fed. Reg. 75,153 (Dec. 2, 2010) (requiring non-lead ammunition for take of migratory birds under a depredation order to prevent toxicity hazards to other wildlife); *see also* ER at 153. Thus, the federal government has been aware of the significant environmental harm caused by the disposal of spent lead ammunition in the environment for more than 30 years, and has taken action in certain contexts to help alleviate such harm.

When lead-core rifle bullets strike an animal they often fragment into hundreds of small pieces of lead that can be found several inches from the site of the wound in large game animals. ER at 152. A very small lead fragment is enough to severely poison or kill a bird, even one as large as a California condor, North America's largest flying bird. *Id*. Wildlife that ingest spent lead ammunition, even in minute amounts, experience many adverse behavioral, physiological and biochemical health effects, including seizures, lethargy, progressive weakness, reluctance to fly or inability to sustain flight, weight loss leading to emaciation, and death. *Id*. In turn, wildlife experiencing these adverse

health effects are far more susceptible to other forms of mortality, such as predation, *id*, and potentially less capable of successful breeding. ER at 65.

Nowhere is the threat of spent lead ammunition in Arizona more apparent than on the Kaibab National Forest. The Kaibab is an approximately 1.6 million-acre parcel of federal property in northern Arizona managed by the Forest Service, bordering both the north and south rims of the Grand Canyon. ER at 145–46. Lead ingestion and poisoning from ammunition has been documented in many avian predators and scavengers that inhabit the Kaibab, including bald and golden eagles, northern goshawks, ferruginous hawks, turkey vultures, and ravens. ER at 151.

But there is no better evidence of the regular exposure to spent lead ammunition and the harmful effects it causes for wildlife than what scientists, including federal government researchers, have documented regarding lead poisoning in California condors. After dwindling to the brink of extinction in the early 1980s, California condors have rebounded due to a captive breeding program administered primarily by the U.S. Fish and Wildlife Service ("FWS"). There are currently only approximately 73 free-flying condors in northern Arizona and southern Utah ("Southwest condor population"). ER at 154. Lead poisoning from exposure to spent lead ammunition is the undisputed primary cause of mortality in this fragile population. ER at 63.

As part of the reintroduction effort, FWS created the Southwest Condor Recovery Team ("SCRT") to study and monitor condors' health and progress toward self-sustainability. Condors have been extensively radio-tracked and have been detected flying over, foraging and roosting throughout the North Kaibab Ranger District. ER at 154. Condor use of the North Kaibab Ranger District is year-round, including breeding and nesting. *Id*.

The SCRT first positively identified lead-related fatalities in the Southwest condor population in the summer of 2000. ER at 59. Since that time, the SCRT has focused on the issue of lead poisoning from spent ammunition, and stressed the critical importance to the species' survival of addressing lead contamination. *See* ER at 57 (concluding "in order to succeed in the establishment of a self-sufficient population of condors, the effects of lead contamination must be reduced or eliminated"). The SCRT repeatedly has confirmed the existence of this substantial and ongoing risk posed by spent lead ammunition in the environment. *See e.g.,* ER at 63 ("Lead poisoning continues to be the number one diagnosed cause of mortality in the southwest condor population. Like the previous five years of the condor release program in Arizona, lead poisoning cases occur predominantly in the fall and winter months and are associated with the big-game hunting seasons.").

In light of the well-established risk, scientists attempt to regularly monitor

lead levels in condors' blood. Free-flying condors frequently have elevated levels of lead in their blood. ER at 155. The SCRT has documented hundreds of instances of lead exposure in condors since the Southwest condor population was reintroduced in 1996. *Id*. Annually, 45 to 95 percent of the condor population tests positive for lead exposure. *Id*. Veterinary intervention is often required to save lead-poisoned condors. *Id*. In many cases, chelation, an expensive and invasive blood treatment, has been required to reverse dangerously high blood lead levels. *Id.*

Since their reintroduction to northern Arizona, condors have foraged on the Kaibab Plateau in the Kaibab National Forest. ER at 155. Condors rely on large-mammal carrion for a major percentage of their food source. ER at 153. The SCRT has documented increases in blood lead levels in condors during and after hunting seasons. *See* ER at 65 (noting "abrupt increase of [condor] blood lead levels has corresponded with increased [condor] use of deer hunting areas on the Kaibab Plateau and southern Utah since 2002"). Condors are particularly susceptible because they are social animals that often feed in groups. ER at 155. As a result, one contaminated carcass or gut pile can poison several condors in the course of one feeding event. *Id*.

In short, lead poisoning from spent lead ammunition has been and continues to be the leading cause of condor mortality in Arizona, and the primary obstacle to

achieving a self-sustaining population of condors there. Because condors are tracked and monitored, including for lead poisoning, more extensively than other species they serve as an indicator of lead exposure occurring to other wildlife inhabiting the Kaibab. As the district court recognized, "[b]ut for Defendant's decision to allow toxic lead ammunition to be disposed of in the [Kaibab National Forest], there would be no lead waste that could be consumed, and local animal species would not suffer from lead poisoning." ER at 6–7.

## II. Forest Service Authority To Stop the Endangerment

As the landowner and manager of the Kaibab, the Forest Service has control over and is actively involved in all activities that occur there. The Kaibab is, after all, a national forest. The Property Clause of the United States Constitution gives Congress the power to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. The "'complete power' that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there." *Kleppe v. New Mexico*, 426 U.S. 529, 540–41 (1976). National Forests are public lands owned by the United States and administered by the Forest Service. 16 U.S.C. § 1609(a).

Congress has vested the Forest Service with broad authority and responsibility to regulate activities on, and occupancy of, the National Forests.

The Forest Service has interpreted its broad statutory authorities to include the ability to issue orders and regulations that prohibit and restrict activities in areas and regions for the purpose of, *inter alia*, protecting "threatened, endangered, rare, unique, or vanishing species of plants, animals, birds or fish." 36 C.F.R. § 261.70(a)(4). The regulations provide that each Forest Supervisor has the authority to restrict the manner in which the public uses the particular Forest Service lands over which the supervisor has jurisdiction. *See id.* § 261.50(a). One of the ways the Forest Service exercises its authority over the use of Forest Service land is by prohibiting commercial uses of National Forest land unless the user first obtains a Special Use permit; commercial guiding and outfitting for hunting trips are included within this regulatory regime. *See generally*, *id.* §§ 251.50–251.65.

Hunting on Forest Service land results in the disposal of spent lead ammunition in the environment. The Kaibab Plateau is renowned for its trophy large-antlered mule deer ("the Kaibab deer") and, as a result, is a popular big-game hunting destination. ER at 153. Despite the availability of non-lead ammunition alternatives, ER at 34–35, wildlife mortality due to lead exposure continues to occur on the Kaibab, as discussed above. The Forest Service has been aware of this problem on the Kaibab for more than a decade, *see* ER at 59, yet it has failed to use its broad authorities to stop the endangerment.

## III.   RCRA's Imminent and Substantial Endangerment Provision

Though the Forest Service has the authority to prevent the endangerment to wildlife on the Kaibab, it continues to contribute to the endangerment rather than stop it.  For scenarios precisely like this, Congress created a provision in RCRA to empower citizens to go to court to ensure that action is taken to address ongoing endangerment.  In enacting RCRA, Congress found that "disposal of solid waste . . . in or on the land without careful planning and management can present a danger to human health and the environment" and that "inadequate and environmentally unsound practices for the disposal or use of solid waste have created greater amounts of air and water pollution and other problems for the environment and for health."  42 U.S.C. § 6901(b)(2)–(3).  Congress authorized citizens to bring suit in federal district court to address risks to the environment posed by improperly controlled and managed solid and hazardous wastes, including spent lead ammunition.

Specifically, RCRA authorizes any person to commence a civil action:

against any person, *including the United States* . . . who has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B) (emphasis added).  Congress recognized the important roles citizens would play in the statutory scheme: "Citizen suits to abate imminent hazards can expand the national effort to minimize these very real threats to our

well-being." Senate Debate, Cong. Rec. S9151 July 25, 1984.

Congress also vested district courts with tremendous power to remedy a potential endangerment. RCRA provides that the district court "shall have jurisdiction . . . *to restrain any person* who has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste referred to in paragraph 1(B), *to order such person to take such other action as may be necessary, or both . . . .*" 42 U.S.C. § 6972(a) (emphasis added). Courts have noted that the "expansive language of this provision was intended to confer 'overriding authority to respond to situations involving a substantial endangerment to health or the environment.'" *United States v. Price*, 688 F.2d 204, 213 (3d Cir. 1982) (citing H.R. Committee Print No. 96-IFC 31, at 32) (1979)).[3] Such a broad,

---

[3] Note that the *Price* decision was discussing 42 U.S.C. § 6973, which sets forth *EPA's* power to bring suit to restrain anyone who is contributing to an imminent and substantial endangerment or issue administrative orders as necessary to protect public health and the environment. But *Price* applies with equal force in the citizen suit context. In amending RCRA in 1984 to add the citizen suit provision, Congress gave citizens the full extent of the power to abate endangerments it had already given EPA. *See* Senate Comm. on Env't and Pub. Works, Solid Waste Disposal Act Amendments of 1983, S. Rep. No. 98–284 (1983); *see also Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 287 (1st Cir. 2006) ("The 1984 amendments introduced a new provision, RCRA § 7002(a)(1)(B), into the statutory scheme. . . . [T]his new provision extended to citizens the right to sue a polluter who may be causing an imminent and substantial endangerment to public health or the environment. The Senate Report that accompanied the 1984 amendments approvingly cited and quoted *Price* on several occasions, specifically endorsing that court's conclusion that section 7003 is intended to give courts the tools to 'eliminate any risks posed by toxic waste.'") (citations omitted).

jurisdictional grant furthers Congress's primary goal behind RCRA endangerment citizen suits, "namely the prompt abatement of imminent and substantial endangerments." H.R. REP. NO. 98–198, pt. 1, at 53 (1984).

## LEGAL STANDARDS

To satisfy the requirements of constitutional standing, a plaintiff must demonstrate injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife* ("*Defenders*"), 504 U.S. 555, 560–61 (1992). A plaintiff's injury must be "concrete and particularized", and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (internal quotations omitted). The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976). And it must be "likely, as opposed to merely speculative," that a favorable decision by the court would redress the plaintiff's injuries. *Id.* (internal quotations omitted) (quoting *Simon,* 426 U.S. at 38, 43).

Traceability and redressability are typically "two sides of a causation coin." *Dynalantic Corp. v. Department of Defense,* 115 F.3d 1012, 1017 (D.C. Cir. 1997). As the Supreme Court commented in *Allen v. Wright,* "[t]o the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the

causal connection between the alleged injury and the judicial relief requested."
468 U.S. 737, 753 n. 19 (1984); *see also Natural Res. Def. Council v. EPA,* 542
F.3d 1235, 1245 (9th Cir. 2008) (noting that the "fairly traceable" and
"redressability" factors of standing "both [] address 'causation,' [and] are "closely
related"). When plaintiffs sought-after relief "is an order compelling the [federal
agency] to end the very inaction which is the cause of plaintiff's injuries,"
causation and redressability are "inseparable." *State of N.Y. v. Thomas,* 613
F.Supp. 1472, 1481 (D.D.C. 1985), *rev'd on other grounds, Thomas v. State of
N.Y.,* 802 F.2d 1443 (D.C. Cir. 1986).

The party invoking federal jurisdiction bears the burden of establishing
standing. *Defenders,* 504 U.S. at 561. "The nature of that burden depends on the
stage of the litigation." *Native Vill. of Kivalina v. Exxon Mobil Corp.,* 696 F.3d
849, 867 (9th Cir. 2012) (Pro, J. concurring). A plaintiff must support each
element of standing "in the same way as any other matter on which the plaintiff
bears the burden of proof, *i.e.*, with the manner and degree of evidence required at
the successive stages of the litigation." *Defenders,* 504 U.S. at 561; *see also Native
Vill. of Kivalina,* 696 F.3d at 867. Accordingly, the procedural posture of this
case—dismissal on the pleadings—frames the inquiry as to the adequacy of the
Center's claims of standing. *See Lucas v. South Carolina Coastal Council,* 505
U.S. 1003, 1012 n. 3 (1992) (distinguishing *Defenders* because "since it involved

the establishment of injury in fact at the *summary judgment stage*, [it] required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful").

At the motion to dismiss stage, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Moreover, in ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the nonmoving party. *W. Ctr. for Journalism v. Cederquist*, 235 F.3d 1153, 1154 (9th Cir. 2000) (per curiam). General factual allegations of standing are sufficient to defeat a motion to dismiss because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Oregon v. Legal Serv. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).[4]

---

[4] The burden of proof for establishing standing increases at each later stage of the litigation. *See Defenders*, 504 U.S. at 561. At the summary judgment stage, plaintiffs "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotations omitted) (citing Fed. R. Civ. P. 56(e)). Then, at the trial stage, to "sustain a favorable judgment, the allegations [supporting standing] must be uncontroverted or proven." *Legal Aid Soc'y of Alameda Cnty. v. Brennan*, 608 F.2d 1319, 1333 (9th Cir. 1979). The district court erred in imposing on the Center, at the motion to dismiss stage in the litigation, "the burden of establishing

Finally, it is reversible error for a court to dismiss a case on standing grounds when there are disputed issues of material fact and the non-moving party was not afforded an opportunity to conduct discovery or present evidence. *See Comm. for Full Emp't v. Blumenthal*, 606 F.2d 1062, 1067 (D.C. Cir. 1979) (reversing district court's dismissal on standing grounds, concluding "[a]t the very least, appellants were entitled to conduct discovery to buttress their allegation that there is a substantial likelihood that the relief they request will eliminate their injury"); *see also Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) ("The court must resolve any genuine disputed factual issue concerning standing, either through pretrial evidentiary proceeding or at trial itself").

## SUMMARY OF THE ARGUMENT

The party invoking federal jurisdiction must establish the elements of Article III standing—injury-in-fact, causation, and redressability. In response to the Forest Service's standing challenge, the district court correctly found the Center established injury, that the Forest Service was a cause of that injury, and that, if found liable, the Forest Service had an "affirmative duty to stop the disposal of environmental contaminants in the [Kaibab National Forest]." ER at 5–7.

The district court then veered off course by adopting the Forest Service's

---

jurisdiction by a preponderance of the evidence." ER at 4; *see also* ER at 5 ("To satisfy Article III jurisdiction, at a minimum, the party asserting standing *must prove*" injury, causation, and redressability).

flawed argument, raised for the first time in its reply brief below, *see* Dkt. 78 at 4, that the court's authority to remedy ongoing endangerment in the Kaibab was limited by the Supreme Court's holding in *Norton v. Southern Utah Wilderness Alliance ("SUWA"),* 542 U.S. 55 (2004). *SUWA* is simply inapplicable to the question of whether the Center has standing in this case. First, *SUWA* was not deciding a standing issue, nor was standing considered at any point in the case history. Moreover, the Supreme Court's holding that courts could not compel discretionary agency action was based *entirely* on statutory construction of Administrative Procedure Act ("APA") § 706(1), a statute not at issue in this case. *SUWA* is plainly irrelevant here, and thus provides no limit on the court's broad statutorily-created and traditional equitable powers to issue an order to the Forest Service to abate an ongoing endangerment.

When viewed through the correct, non-*SUWA* lens, the Center clearly established redressability sufficient to withstand a motion to dismiss. In giving courts broad power under RCRA to protect the environment from the risks of improperly disposed of waste, Congress provided a remedy for the endangerment caused by spent lead ammunition on the Kaibab National Forest. Here, that statutory remedy effectively answers the constitutional question of redressability: the district court has the express power to restrain the Forest Service from continuing to contribute to the endangerment, or to order the Forest Service to take

action as may be necessary to abate the endangerment.  42 U.S.C. § 6972(a)(1)(B).

Although Article III standing is often articulated and analyzed as three separate elements—injury, causation and redressability—the elements are not always neatly separable.  In cases such as this one, when the party that causes the injury is the same party with the ability, authority, and "affirmative duty" (ER at 6) to stop it, redressability flows naturally from a finding of causation.  The two elements are, for all practical and legal purposes, two sides of the same coin.  In unjustifiably prying the redressability element apart from causation, the court ignored the plain language of RCRA and the statute's broad grant of authority to courts to promptly abate a known endangerment. In other words, the court erroneously concluded it could not do what Congress in RCRA explicitly told courts they could do.

Beyond this fundamental flaw, the district court erred in several other ways. First, the court incorrectly concluded that any order it issued to stop the continuing endangerment on the Kaibab would require APA rulemaking, and because the outcome of such rulemaking is uncertain, redressability is speculative.  ER at 7–8.  The district court's notions of uncertainty—which are inherent in *any case* in which the government must take future actions—resulted in a redressability analysis detached from the plain meaning and intent of RCRA, and disjointed from the rest of the court's correct conclusions on the Center's standing to bring this

suit.  Even if the Forest Service concluded that it had to engage in rulemaking to comply with the court order, the ultimate *outcome* would be known: an end to the Forest Service's contribution to endangerment on the Kaibab.  Accordingly, redressability would be certain, even if the precise manner of compliance were not. The district court's conclusion to the contrary—that future agency rulemaking poses a standing problem for plaintiffs—flatly contradicts this Circuit's holding in *Natural Resources Defense Council v. EPA* ("*NRDC*"), 542 F.3d 1235 (9th Cir. 2008).

Additionally, the court ignored clear legal precedent that redressability is not precluded by the possibility of partial relief.  The court found that, because condors are long-distance fliers, they might be exposed to spent lead ammunition beyond the Kaibab National Forest borders, *in addition to* the harm condors currently experience in the Kaibab.  ER at 8.  However, even if the district court were correct that stopping the endangerment in the Kaibab would not eliminate *all* threats to condors posed by spent lead ammunition, such an injunction would, at a minimum, reduce the risk that lead exposure, poisoning and mortality would occur to condors. Courts have recognized in numerous contexts that such a reduction of risk of harm—or partial relief—satisfies Article III redressability.  Here, the court's ability to reduce the risk to condors in the Kaibab is critical to the Center *precisely because* condors, a vulnerable population of 73 birds, face similar risks outside of

the Kaibab.  Finally, the district court compounded its legal error regarding the availability of partial relief by making impermissible factual findings at this early stage of the litigation, including failing to account for allegations regarding endangerment to wildlife other than condors.

An order from the district court requiring the Forest Service "to take such other action as may be necessary" to stop the endangerment to the environment caused by spent lead ammunition would redress the Center's clearly articulated and recognized injuries.  42 U.S.C. § 6972(a).  Although, such an order may not redress the Center's "every injury," that is not what the Constitution requires. Likewise, even if the court cannot specify the precise manner of compliance needed to stop or minimize the endangerment, so long as the Forest Service was required to comply with the court's order that it take some action to effectively accomplish that result, the Center's injuries would be redressed.  Because the Complaint and incorporated materials, when construed in the Center's favor as they must be, more than sufficiently allege redressability, this Court should reverse the district court's order and find that the Center has established standing at this stage in the litigation.

## ARGUMENT

The district court's redressability analysis was far off the mark.  The court failed to give effect to the Congressionally-crafted remedy the Center seeks in this

case, misapplied an APA case to a standing inquiry, ignored binding precedent that the possibility of future rulemaking does not render redressability speculative, and misunderstood both the law and the facts regarding the sufficiency of partial relief. To be sure, the district court properly concluded that the Center satisfied the pleading requirements for injury and causation, and the Center does not appeal the court's findings therein. However, because the elements of standing are so closely linked, and to better see how the court's redressability analysis *should have* flowed from its injury and causation analysis, the Center has set forth the correct framework for all three elements of standing in this case.

The framework, as discussed in detail below, is as follows. First, the Center's members' aesthetic, recreational, professional, and commercial interests are undeniably harmed by the diminished ability to observe healthy wildlife such as the iconic California condor in its natural habitat. Second, these injuries are fairly traceable to the Forest Service's failure to stop the poisoning and mortality of condors and other wildlife from spent lead ammunition on the Kaibab National Forest. And third, the Center's members' injuries would likely be redressed by a court order requiring the Forest Service to abate the endangerment, which is the exact remedy Congress provided for in RCRA.

The district court erred in dismissing the Center's case for lack of standing. This Court reviews the district court's determination *de novo*. *Hall v. Norton*, 266

F.3d 969, 975 (9th Cir. 2001).

## I.    The Center Sufficiently Alleged Injury-In-Fact

The district court correctly found that the Center established injury-in-fact that is "concrete and particularized."  ER at 5.  The law recognizes the Center's members' desire to observe animals as "undeniably a cognizable interest for purpose of standing."  *Defenders*, 504 U.S. at 562–563.  The Complaint sufficiently alleged that the Center's members regularly visited the Kaibab National Forest and adjacent areas, such as the Grand Canyon National Park, to observe, photograph, view, study, and experience wildlife in their natural habitat, including wildlife harmed by the disposal of spent lead ammunition on the Kaibab.[5]  ER at 147.  These members consider the opportunity to view, photograph, study, and experience healthy wildlife in their natural habitat to be an important and aesthetically significant aspect of their visits to the Kaibab.  *Id.*  The endangerment to condors and other wildlife on the Kaibab injures the Center by decreasing its members' opportunities to observe and encounter those species.  *See*

---

[5] In addition, the Center submitted declarations of individual members.  All of the declarants attested that they live in Arizona and regularly visit, and intend to visit in the future, the Kaibab National Forest and nearby areas, such as Grand Canyon National Park.  *See, e.g.*, ER at 40 (stating plans to return to Kaibab this year and in the future); ER at 20–21 (trip planned to Kaibab in February or March 2013); ER at 34–35 (describing regular visits to Kaibab and plans to return); ER at 15–16 (visited the Kaibab more than 20 times and specific plans to return); ER at 27 (chose to live in northern Arizona in order to be in close proximity to Kaibab National Forest and Grand Canyon National Park for hiking activities); ER at 35 (specific plans to return to Kaibab hunt with lead-free ammunition).

*Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992) (holding that "diminished opportunity of [plaintiff's] members to view the northern bison herd in Yellowstone establishes standing."). The knowledge that those species are routinely exposed to and poisoned by spent lead ammunition diminishes the Center's members' recreational and aesthetic enjoyment during their Kaibab trips. *See e.g.,* ER at 16 (standing declarant Robin Silver stating: "The Forest Service's failure to prevent the needless and unnecessary poisoning of wildlife in the Kaibab National forest has adversely affected and will adversely affect in the future my recreational, professional, and aesthetic enjoyment of the area."). As this Circuit has recognized, "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).

The district court was correct in finding the Center has clearly met its burden with respect to the injury element of standing.

## II.    The Center Sufficiently Alleged Causation

The district court also correctly found the Center established causation. To satisfy the causation element of constitutional standing, plaintiffs must show that their injury is "fairly traceable" to the acts or omissions of the defendant. *Steel Co.*

*v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). As recognized by this Circuit, causation "need not be so airtight [on a motion for summary judgment] as to demonstrate that the plaintiffs would succeed on the merits." *Ecological Rights Found.*, 230 F.3d at 1152 (9th Cir. 2000).

Condors and other wildlife are being poisoned because of the Forest Service's failure to stop the disposal of spent lead ammunition on the Kaibab National Forest. The chain of causation between the Forest Service and the Center's injury could hardly be more straightforward. As landowner of the Kaibab, the Forest Service has authority over activities that occur on the Kaibab. *See Kleppe*, 426 U.S. at 546 ("We hold today that the Property Clause also gives Congress the power to protect wildlife on the public lands, state law notwithstanding."); *see also supra* at 10–11 (discussing the Forest Service authority on National Forests).[6]

In addition to its role as landowner, which plainly establishes causation, the

---

[6] More than 80 years ago, in *Hunt v. U.S.*, 278 U.S. 96 (1928), the Supreme Court recognized the Forest Service's control over the very forest at issue in this case. At issue in *Hunt* was the Secretary of Agriculture's decision to kill deer on the Kaibab and the Grand Canyon National Game Preserve in order to protect plants from the deer over-foraging. *Id.* at 99–100. The Supreme Court held that the Secretary acted "within the authority conferred upon him by act of Congress[,]" noting specifically that the Secretary had the authority to "protect [the United State's] lands and property . . . *the game laws or any other statute of the state to the contrary notwithstanding.*" *Id.* at 100 (emphasis added)."

Forest Service also has undisputed primary regulatory authority over use and occupancy of National Forest land. In seeking to dismiss the Center's case below, the Forest Service never seriously contended it did not have the requisite authority. This Circuit has found oversight or regulatory authority sufficient to establish causation for standing purposes in RCRA imminent and substantial endangerment cases. In *Covington v. Jefferson County,* a local regulatory agency argued that plaintiffs lacked standing to assert RCRA endangerment claims against the agency because the agency "ha[d] only regulatory oversight and g[ave] technical guidance, but [was] not responsible for enforcement or corrective action." 358 F.3d 626, 639 (9th Cir. 2004). This Court found the agency's argument unpersuasive, noting that although another agency may have been the "lead agency" for corrective actions, this did not preclude the agency with regulatory authority from "initiating corrective action" on its own or using "other coercive tools at its ready disposal" to address the endangerment. *Id.* at 640. The Ninth Circuit concluded that the regulatory agency in *Covington* had options to abate the endangerment, and if it "declined to take any of these regulatory actions, such inaction, which is correctable by court order or sanction, meets the causation and redressability elements of standing." *Id*. at 639. The same conclusion applies here.

Because the Forest Service is the owner and manager of the public lands where the disposal of lead ammunition is occurring, has known about the

endangerment it causes for more than a decade, and has the undisputed authority to prevent it, the Center's injury is fairly traceable to the Forest Service's failure to stop the disposal of spent lead ammunition on the Kaibab.

To the extent the Forest Service intends to renew its argument that any causal connection to the agency is broken by the acts of third parties, reliance on such an argument would be misplaced. Neither the State of Arizona nor individual hunters on the Kaibab break the causal chain or relieve the Forest Service of its responsibility, as landowner, for the environmental endangerment that causes the Center's injuries. ER at 6 ("Although Defendant may choose not to ban certain types of ammunition in deference to Arizona's regulation of hunting, it is not thereby automatically relieved of its affirmative duty to stop the disposal of environmental contaminants in the [Kaibab]."); *see also Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 941–42 (D.C. Cir. 2004) (describing cases holding "that plaintiffs have standing to challenge government action … where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress").

In this case, the Forest Service has the authority to control the actions of third parties on its property. The Forest Service does not, and cannot, seriously contest this authority. The Center's injuries are thus fairly traceable to the failure

of the Forest Service to stop the disposal of spent lead ammunition on the Kaibab, and the district court was correct to find causation.

## III.  The Center Sufficiently Alleged Redressability

After having correctly concluded that the Center adequately alleged injury and causation, the district court's standing analysis took a wrong turn, as the court erroneously concluded the Center did not establish redressability.  ER at 7–8.  As discussed above, causation and redressability are closely connected; causation "focuses upon the relation between the defendant or the defendant's conduct and the plaintiff's injury[,]" whereas "[r]edressability requires an analysis of whether the court *has the power to right or to prevent the claimed injury*."  *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (emphasis added).  Here the district court "has the power to right or prevent" the Center's injury *because Congress gave it that power under RCRA*.  Congress created the remedy the Center seeks here when it authorized courts "to restrain any person who has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste . . . ."  42 U.S.C. § 6972(a).

Because the district court found that the Center established causation, it should have found that it could issue a favorable order redressing the Center's injuries.  A court order requiring the Forest Service to stop the endangerment caused by spent lead ammunition would redress the Center's injuries because the

third parties would be required to comply with whatever action the Forest Service took in response to the court's order. The reasoning is that simple.

The district court entirely missed this fundamental principle. Instead, the court became distracted by the Forest Service's reliance on *SUWA* and notions of uncertainty due to potential future rulemaking. It then made legal and factual errors regarding the effect of partial relief on satisfying redressability. The district court's conclusions on redressability were thus incorrect, and this Court should reverse its judgment.

### A. The Court Can Redress the Center's Injuries By Ordering the Forest Service To Stop the Endangerment

Congress provided, in RCRA, the precise remedy that would redress the Center's injuries. The court can redress the Center's injuries by ordering the Forest Service to stop the endangerment caused by the disposal of spent lead ammunition on the Kaibab. To establish redressability, "a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994). Generally, "[a] plaintiff seeking injunctive relief shows redressability by alleging a continuing violation or the imminence of a future violation of the statute at issue." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (internal quotation and citation omitted); *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166,

1177 (9th Cir. 2002) ("[W]hen federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute.").

Here, the Forest Service is causing the Center's injuries by failing to stop the disposal of spent lead ammunition on the Kaibab. Since the initiation of this lawsuit, disposal of spent lead ammunition has continued on the Kaibab, and wildlife species there have continued to suffer from lead poisoning. In the absence of injunctive relief, spent lead ammunition will continue to be disposed of on the Kaibab and thus continue to endanger the environment. Such actions undermine the purpose of RCRA generally, and specifically undermine the purpose of RCRA's endangerment provision. When enacting the RCRA endangerment provision, Congress "sought to invoke nothing less than the full equity powers of the federal courts in the effort to protect public health, the environment, and public water supplies from the pernicious effects of toxic wastes." *Price,* 688 F.2d at 214 ("Courts should not undermine the will of Congress by either withholding relief or granting it grudgingly."). If the court ordered the Forest Service to prohibit the disposal of spent lead ammunition on the Kaibab, and the Forest Service complied with such an order, the risk to wildlife of being exposed to spent lead ammunition on the Kaibab would be eliminated.

The district court need only have looked to the language of RCRA itself to

conclude that it had the authority to issue an order requiring the Forest Service to abate the endangerment. RCRA expressly grants district courts the power to restrain any person, *including federal agencies*, from contributing to the disposal of waste that may present an imminent and substantial endangerment to the environment, or to order such agencies "to take such other action as may be necessary" to stop contribution to the endangerment. 42 U.S.C. § 6972(a). This language should end this matter. *See Meghrig v. KFC W., Inc.,* 516 U.S. 479, 484 (1996) ("Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA."). Thus there can be no question that, if the court finds the Forest Service liable for contributing to an endangerment on the Kaibab and issues a injunction to the Forest Service to abate the endangerment, the Forest Service would have to comply with the order. *Id.* The Forest Service would have to abate the endangerment.

Put another way, the statutory remedy effectively answers the constitutional question of redressability in this case. While it is true that Congress cannot wholly create constitutional standing, Congress can develop statutory remedies that determine whether the court "has the power to right or to prevent the claimed

injury." *Gonzales,* 688 F.2d at 1267. This Circuit and others have explicitly recognized as much. *See, e.g., NRDC,* 542 F.3d at 1248 ("Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects."); *see also Alaska Ctr. for the Env't v. Browner ("ACE"),* 20 F.3d 981, 984–85 (9th Cir. 1994) (rejecting EPA's redressability arguments in Clean Water Act case; noting that "Congress has determined that the relief plaintiffs seek is the appropriate means of achieving desired water quality. . ."); *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811–12 (D.C. Cir. 1983) ("[A]s Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act.").

Under RCRA, courts regularly exercise their power to enjoin parties from creating or contributing to an imminent and substantial endangerment. *See, e.g.,* *Interfaith Cmty. Org. v. Honeywell Int'l., Inc.,* 399 F.3d 248, 266 (3d Cir. 2005) (upholding injunction requiring remedial action "as it requires only what is necessary now to abate the established endangerments"); *Cox v. City of Dallas,* No. 3:98–cv–0291–H, 1999 WL 33756551, at **1–3 (N.D. Tex. 1999), *aff'd,* 256 F.3d 281 (5th Cir. 2001) (ordering the City of Dallas and the owners of open garage

dumps to "take the steps necessary to prevent future open dumping and to cause the removal of any solid waste dumped on the site in the future").

This Circuit's precedent in cases brought against federal agencies under other environmental statutes supports the conclusion that the injunctive relief the Center seeks would redress its injuries. For example, in *ACE,* environmental groups brought a CWA citizen suit against EPA, seeking to compel EPA to establish water quality protection measures for Alaskan waters. 20 F.3d at 982. The district court, upon finding that EPA violated the CWA, issued "general directives" to EPA to ensure its compliance with the CWA. *Id.* at 984, 986. The court "l[eft] the substance and manner of achieving that compliance entirely to the EPA." *Id.* at 987; *see also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin. ("NEDC")*, 477 F.3d 668, 680–81 (9th Cir. 2007) (finding that because it had the power to order "'mandatory affirmative relief' … at least for a period of time in which [defendant] can reconsider its action in accordance with [the court's] opinion[,]" NEDC's injury was redressable).

The relief issued by the district court in *ACE* clearly demonstrates that the court here could, upon finding the Forest Service liable for endangerment, order the Forest Service to fix the problem. As the Ninth Circuit noted in upholding the district court's remedy:

> In enacting environmental legislation, and providing for citizen suits to enforce its directives, Congress can only act as a human institution,

> lacking clairvoyance to foresee the precise nature of agency dereliction of duties that Congress prescribes. When such dereliction occurs, it is up to the courts in their traditional, equitable, and interstitial role to fashion the remedy.

20 F.3d at 987. As in *ACE,* the Forest Service has known about the facts underlying the endangerment for "well over a decade" but has failed to stop the endangerment and comply with RCRA. *See* ER at 59. Thus, the court has the authority to use its equitable discretion in the face of such "dereliction" to prevent additional delay in addressing a known problem.[7]

Importantly, as seen in *ACE,* such an order can take the form of a "general directive," leaving the details of *how* the Forest Service is to achieve compliance with RCRA to the discretion of the agency. And this principle is well established in many Circuits, and in other statutory contexts, in suits brought against governmental entities. *See, e.g., Strahan v. Coxe,* 127 F.3d 155, 158 (1st Cir. 1997) (injunction requiring state officials to apply for ESA permits, "develop and prepare a proposal" to limit the likelihood that endangered Northern Right whales would be harmed by certain fishing gear, and convene a working group to discuss measures to minimize harm to the whales); *c.f. Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.,* 148 F.3d 1231, 1254–55 n.27 (11th Cir. 1998) (listing

---

[7] Moreover, in cases involving matters of public interest, the Ninth Circuit has found that a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *NEDC,* 477 F.3d at 680 (quoting *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005)).

examples of remedies that would redress plaintiffs' injuries, but leaving it to the district court "to fashion appropriate injunctive relief if it finds Volusia County liable for [plaintiffs'] 'harm'").

In summary, because the district court had the clear statutory authority to order the Forest Service to stop the endangerment—firmly grounded in case law regarding the power of courts to effectuate relief for ongoing violations of federal law—it should have found that the Center's injuries were redressable.

**B.**     ***Norton v. Southern Utah Wilderness Alliance* Does Not Apply**

Instead of relying on the statutory remedy Congress provided in RCRA, the district court premised its redressability analysis, in large part, on *SUWA*, an APA § 706(1) case that plainly does not apply to a RCRA citizen suit. The Supreme Court's holding in *SUWA* that courts cannot compel certain agency actions was based entirely on analysis of the statutory text of the APA, and is thus wholly irrelevant to the this non-APA case. Moreover, the issue of standing was never raised in *SUWA*; nor is the Center aware of a single case in which a court has relied on *SUWA* to conclude a plaintiff does not have standing. Thus, the district court erred in accepting the Forest Service's misguided reliance on *SUWA* in an effort to limit citizen access to judicial relief.

In *SUWA,* plaintiffs brought a claim against a federal agency under APA § 706(1), which authorizes courts to "compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. § 706(1). The plaintiffs argued that the agency was required to take action with respect to off-road vehicle use in order for the agency to comply with a general statutory mandate. The Supreme Court rejected the plaintiffs' claims, holding that an APA § 706(1) suit "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA,* 542 U.S. at 64. Based on this holding, the district court in this case—assuming that the remedy would involve rulemaking—found that redressability was "speculative" because courts cannot compel agencies to perform discretionary duties. ER at 7.

As an initial matter, *SUWA* is inapplicable here because standing was not at issue in the case. It was never raised by the parties, nor addressed by the lower courts or the Supreme Court. What is more, of the 338 reported Supreme Court, appellate, and district court cases citing to *SUWA* to date, not a single one of these cases relies on *SUWA* as a basis for dismissal for lack of constitutional standing. In fact, only two cases cite *SUWA* in the context of standing at all, and both do so to *explicitly reject SUWA*'s application to the issue of standing. *See The Wilderness Soc'y v. Kane Cnty., Utah*, 581 F.3d 1198, 1213 n.8 (10th Cir. 2009) (*rev'd en banc on other grounds,* 632 F.3d 1162, 1171 (10th Cir. 2011)) ("[*SUWA*] is inapposite for several reasons, not the least of which is that [*SUWA*] was not a constitutional standing case but rather concerned the

availability of relief under the [APA] for agency inaction."); *K-V Pharm. Co. v. U.S. Food & Drug Admin.*, 889 F. Supp.2d 119, 131 n.7 (D.D.C. 2012) (declining to apply *SUWA* to the issue of redress, because "[*SUWA*] involved the reviewability of agency inaction under the APA and did not address redressability").

Second, the relevant holding in *SUWA* was specifically tied to, and based on, the Supreme Court's interpretation of APA § 706(1). The Court reached its interpretation of APA § 706(1) only after engaging in a lengthy analysis of the statutory language and case law applying that specific provision. *SUWA,* 542 U.S. at 62–65. Unlike the *SUWA* plaintiffs, the Center does not claim that the Forest Service must take a specific action because of a general mandate; nor does the Center seek to "compel agency action unlawfully withheld or unreasonably delayed" under APA § 706(1). The Center's claim is that the Forest Service is liable under RCRA for contributing to the disposal of spent lead ammunition on the Kaibab that may present an "imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). As the Center is not claiming that the Forest Service failed to take a required agency action under APA § 706(1), *SUWA* is inapplicable.[8]

---

[8] Indeed, because the Center has a cause of action under the citizen suit provision of RCRA, it could not bring an APA claim against the Forest Service in any event. *See* 5 U.S.C. § 704 (providing a right of action only when a plaintiff has "no other

Many courts have recognized that *SUWA* does not apply outside the context of APA § 706(1). *See, e.g., NEDC,* 477 F.3d at 681 n.10 (finding *SUWA* inapplicable because plaintiffs were challenging a final agency action under APA § 706(2), not seeking redress for agency inaction under APA § 706(1)); *Valentini v. Shinseki,* 860 F.Supp.2d 1079, 1096 (C.D. Cal. 2012) (finding *SUWA* inapplicable in a case involving APA § 706(2)). The Center is unaware of a single case in which a court has applied *SUWA* to actions other than APA § 706(1) and mandamus claims, much less to a citizen suit based on a statute other than the APA itself.[9]

adequate remedy in a court"); *Bennett v. Spear,* 520 U.S. 154, 175 (1997) (discussing APA § 704 and noting the difference between citizen suits and APA actions); *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1005 (9th Cir. 1998) ("Indeed, as far as we can tell, every court that has addressed the question has agreed: '[I]f a plaintiff can bring suit against the responsible federal agencies under [a citizen-suit provision], this action precludes an additional suit under the APA' . . . . "We will not swim against such a cohesive tide of authority. Because the RCRA citizen-suit provision constitutes an 'adequate remedy,' we lack jurisdiction to review [plaintiff's] claim under the APA.").

[9] It should be no surprise that some courts have discussed *SUWA* in the context of mandamus actions, as *SUWA* itself explained that APA § 706(1) was based on the concept of mandamus suits. *See SUWA*, 542 U.S. at 63 ("In this regard the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs-principally writs of mandamus under the All Writs Act, now codified at 28 U.S.C. § 1651(a)."); *see also United Mine Workers of America, Int'l Union v. Dye*, No. 06–1053 (JDB), 2006 WL 2460717, at *9 (D.D.C. 2006) (citing *SUWA* for proposition that "a delay cannot be unreasonable with respect to action that is not required" in case where plaintiff sought mandamus relief). Thus the fact that some courts have relied on *SUWA* in analyzing mandamus suits provides no support for extending *SUWA*'s reach beyond APA § 706(1), much less to this case.

At bottom, *SUWA* is *wholly* irrelevant to this case. The court can clearly order the Forest Service, as a liable party, to cease contributing to a known RCRA endangerment to the environment.

### C. Any Uncertainty Associated with the Process of Complying with a Court Order To Stop the Endangerment Does Not Defeat Redressability

In addition to inappropriately constraining its own authority in reliance on *SUWA*, the district court focused its redressability analysis on misplaced notions of uncertainty. If a court were to order the Forest Service to prevent a known endangerment from occurring, and the Forest Service determined compliance with that order required rulemaking,[10] it does not follow that redressability is

---

[10] The Center does not concede that rulemaking would be required to effectuate relief in this case. The district court discussed only one regulation under which the Forest Service could take action, 36 C.F.R. § 261.70. ER at 7. That regulation pertains to the Forest Service's issuance of regulations; thus it makes sense that the provision requires the Forest Service to follow the APA § 553 rulemaking procedures in issuing any regulations pursuant to that section. The district court overlooked, however, the Forest Service's ability to stop the endangerment without going through notice and comment rulemaking under the APA. For example, the Forest Service has the authority to issue orders to "close or restrict the use of" National Forests. 36 C.F.R. § 261.50(a). The Forest Service may, *inter alia*, issue orders prohibiting or restricting several categories of activities, including "discharging a firearm," and "hunting." 36 C.F.R. § 261.58(m), (v). These regulations impose no requirement to go through notice and comment rulemaking in issuing such orders. The district court compounded its errors here by assuming a significant layer of additional process would be required by NEPA or consultation with the State of Arizona. ER at 8. Although the Forest Service must comply with NEPA in issuing orders pursuant to 36 C.F.R. § 261.50, the *level of NEPA analysis* the Forest Service would do is unknown at this stage, and may, in

"speculative" for Article III purposes. If courts were to require "a precise showing" as to the outcome of the rulemaking process, "*no* plaintiff would have standing to bring such a suit, as one cannot demonstrate the efficacy of regulations that have yet to be issued." *NRDC*, 542 F.3d at 1246 (internal quotations omitted). In short, this Circuit has already answered a central question at issue in this case— that is, does the uncertainty in the precise outcome of future rulemaking present a constitutional standing problem? In *NRDC* the court firmly said "no." Thus, the district court in the instant case erred in concluding otherwise.

*NRDC* was a "failure to regulate" case in which environmental plaintiffs sought to compel EPA to promulgate regulations under the CWA. In this "failure to regulate" context, the court required a lesser showing of causation and redressability. *NRDC*, 542 F.3d at 1238, 1246 n.6. Courts have typically applied this lesser standard for demonstrating causation and redressability to cases involving procedural violations: parties can enforce a procedural right "so long as the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing." *Id.* (quoting

---

fact, be quite limited. Further, there is simply no basis to conclude that coordinating with the state would prevent or render speculative the Forest Service's ability to comply with a court order. But at bottom, arguments about whether the Forest Service must engage in rulemaking, comply with NEPA, or consult with the state are distractions from the main point discussed herein: these steps are simply irrelevant to whether the Center can meet constitutional standing requirements.

*Defenders*, 504 U.S. at 573 n.8). In *NRDC,* the court extended this same reasoning to "failure to regulate" cases, noting that a less-than-entirely-precise showing of causation and redressability was adequate because "[t]he Supreme Court has noted that suits to force an agency to engage in a procedure do not require the same certainty that the result of that procedure will have the desired effect." *NRDC,* 542 F.3d at 1246, n.6 (citing *Massachusetts v. EPA,* 549 U.S. 497, 518 (2007)). Based on this reasoning, the *NRDC* court concluded that the plaintiffs could show causation and redressability by showing that the sought-after regulations aimed to address the cause of their injury and were likely to reduce the cause of their injury. *NRDC*, 542 F.3d at 1245–46.

Though the Center's requested relief also implicates future actions of a federal agency, it should be *easier* to establish standing in this case than in the *NRDC* "failure to regulate" context. Here, the Center's injuries are caused by disposal of spent lead ammunition on the Kaibab. The order that the Center seeks from the court—an order requiring the Forest Service to abate the endangerment on the Kaibab—is directly aimed at addressing the Center's injuries. And such an order would reduce the risk to the Kaibab environment that causes the Center's injuries. Thus, any uncertainty associated with manner in which the Forest Service chooses to comply with a court order requiring the agency to abate the endangerment does not create uncertainty as to the fact that the Forest Service *will*

*have to do so.*

In *NRDC,* the court was not ordering the EPA to achieve a specific environmental goal or limitation on pollution based on what was necessary for environmental protection, but rather the court was simply ordering the agency to ensure that regulations were promulgated that required the agency to set limits and guidelines based on technological advances in pollution control. In this respect, the outcome of the process here (abating an endangerment) is far more certain than the outcome of the regulatory action EPA would take in *NRDC* (technology-based guidelines and limitations that may or may not achieve significant environmental protection).[11] Thus, as this Court found redressability in *NRDC*, it should do so easily here.

Many other courts have found that plaintiffs have standing despite the fact that the precise outcome of agency action following a favorable court decision

---

[11] Courts give EPA considerable deference in establishing technology-based effluent limitations under the Clean Water Act. *See, e.g., BP Exploration & Oil, Inc. v. EPA*, 66 F.3d 784, 796 (6th Cir. 1995) ("[The Clean Water Act's] requirement that EPA choose the 'best' technology does not mean the chosen technology must be the best pollutant removal."). Further, EPA's decisions regarding what constitutes the best technology are subject only to arbitrary and capricious review. *See, e.g., Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 564–65 (D.C. Cir. 2002) (holding that EPA did not act arbitrarily and capriciously in determining that a particular pollutant control technology was not available because of economic concerns). Thus, *NRDC*, a suit to force EPA to promulgate technology-based limits—which are not outcome-driven and necessarily incorporate significant agency deference—presents a closer call on redressability than a case like this. Here, through injunctive relief, the Center's suit would ensure a result: abatement of endangerment to wildlife from spent lead ammunition.

might be uncertain. As the D.C. Circuit explained about cases against the government:

> [Redressability] . . . is met when a plaintiff establishes that his alleged injury "'is likely to be redressed by a favorable decision.'" The degree of likelihood required is not completely clear. However, because the relevant inquiry is directed to the effect of a future act (the court's grant of the requested relief) it would be unreasonable to require the plaintiff to *prove* that granting the requested relief is *certain* to alleviate his injury. . . . Thus, a court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting relief to those injured by illegal governmental action.

*Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248 (D.C. Cir. 1983) (footnotes omitted) (*rev'd on other grounds*, 467 U.S. 340 (1984)). Other D.C. Circuit cases are also instructive. For example, in *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, the D.C. Circuit considered a petition for review of a NHTSA rule lowering minimum fuel economy standards for cars manufactured in certain years. 901 F.2d 107, 110 (D.C. Cir. 1990). NHTSA argued that "since a court may not direct an agency to issue a particular rule on remand, [plaintiff] . . . failed to demonstrate redressability." *Id.* at 117. The D.C. Circuit rejected NHTSA's argument, stating that "[plaintiffs] need not prove that granting the requested relief is certain to redress their injury…. A remand that would leave the agency free to exercise its discretion in a proper manner … could lead to agency action that would redress petitioners' injury, *even if it were to require initiation of a new rulemaking proceeding*." *Id.* at 117–18 (emphasis

added).

Likewise, in *Animal Legal Defense Fund v. Glickman*, the D.C. Circuit rejected a standing challenge in a case alleging that the Department of Agriculture failed to adopt minimum standards for primate safety required by the Animal Welfare Act. 154 F.3d 426 (D.C. Cir. 1998). With respect to redressability, the court found that "more stringent regulations" would redress plaintiffs' injury, despite the fact that the precise content of any subsequent regulations was unknown, as was the certainty that any more stringent regulations would be enforced against third parties. *Id*. at 443–44*; see also Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 927–28 (7th Cir. 2008) (in case involving challenge to Clean Air Act permit, rejecting defendant's argument that redressability was too speculative because the company would have to seek out and receive a new permit with unknown permit levels); *Loggerhead Turtle,* 148 F.3d at 1254–55 n.27 (finding plaintiffs had standing and providing examples of remedies that would redress plaintiffs' injuries, but leaving it to the district court "to fashion appropriate injunctive relief if it finds Volusia County liable for [plaintiffs'] 'harm'"). Thus, courts cannot base their redressability determinations on their "pre-judgment" of the outcome of the available relief. *Tyler v. Cuomo*, 236 F.3d 1124, 1133 (9th Cir. 2000) (finding that district court erred by prejudging the outcome of the consultation process when considering whether plaintiffs had

standing to sue).[12] This is particularly true at the motion to dismiss stage. *See Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 870 (9th Cir. 2002) (finding plaintiffs' claim of redressability "speculative" but finding complaint satisfied redressability requirement at early stage of litigation).

The Forest Service controls and manages activities that occur on its property, including the actions of third parties such as hunters. As discussed above, the hunters on the Kaibab must follow the Forest Service's policies and regulations when using the Kaibab. Thus, regardless of how the Forest Service might choose to abate the endangerment, because of its control over third-party users on the Kaibab, the outcome would be the same: no disposal of spent lead ammunition on the Kaibab.[13] Therefore, any uncertainty associated with the rulemaking process—a process that must ultimately result in compliance with a court order restraining the Forest Service from contributing to an endangerment— cannot be the basis for finding redressability too speculative for Article III

---

[12] Notably, none of these cases applied the relaxed standards of causation and redressability that courts apply in "procedural" cases. These cases all applied the traditional tests for causation and redressability that apply to injuries caused by substantive violations of law. While the Center believes that the lower standards should apply in this case, pursuant to this Circuit's precedent in *NRDC*, it also meets the higher standards the above cases applied.

[13] While the Center believes that prohibiting the use of lead ammunition within the Kaibab, as the federal government has done in other contexts to protect wildlife (*see supra* at 5–6), likely is the most effective way to prevent the endangerment to the environment and redress its injuries, the parties and the court have not had the benefit of discovery and expert testimony to evaluate whether this is, in fact, the only way to abate the endangerment.

standing.

### D. Reduction of a Known Risk Satisfies Redressability

Contrary to the district court's conclusion, the Center need not show that a favorable decision would completely redress the Center's injuries. The Center's members are injured when the wildlife they want to view and enjoy when they visit the Kaibab and Grand Canyon National Park is exposed to spent lead ammunition. This exposure both decreases the members' opportunities to encounter the exposed wildlife—either due to mortality, ER at 152, reduced ability to successfully reproduce, ER at 65, or, in the case of condors, because they have been removed from the wild for treatment for lead poisoning, ER at 155—and diminishes their enjoyment when they do encounter wildlife because they visit the Kaibab to observe healthy wildlife, not debilitated, suffering animals. It is sufficient redress, therefore, to show that a favorable court order will result in a reduction in the risk to wildlife caused by the disposal of spent lead ammunition on the Kaibab, which, in turn, will both increase the Center's opportunities to encounter wildlife and increase their enjoyment of wildlife they are observing.

This Circuit has held that plaintiffs can satisfy redressability by showing that their sought-after relief is "likely to reduce the risk of the pollution causing their injury." *NRDC*, 542 F.3d at 1246; *see also Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2755 (2010) (holding that "a judicial order prohibiting the growth

and sale of all or some genetically engineered alfalfa would remedy [plaintiffs'] injuries by eliminating or *minimizing the risk* of gene flow to conventional and organic alfalfa crops") (emphasis added). Similarly, here, a court order requiring the Forest Service to stop the endangerment in the Kaibab would eliminate the opportunity for exposure to spent lead ammunition for wildlife species there, thus "minimizing" the risk that wildlife will suffer or die from such exposure. That the same wildlife may continue to be exposed to spent lead ammunition elsewhere only makes the reduction in risk of exposure in the Kaibab more critical to the Center's interests.

A long line of cases outside of this Circuit also supports the principle that plaintiffs can establish redressability by showing a reduction in the risk of the harm that causes their injuries. *See, e.g.*, *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990) (in a CWA suit, noting that plaintiffs "need not show that the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III"); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012) ("[E]ven if [the plaintiffs] would not be out of the woods, a favorable decision would relieve their problem to some extent, which is all the law requires.") (internal quotations omitted); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) ("[E]ven a small probability of injury is sufficient to create a case or controversy . .

. provided . . . that the relief sought would, if granted, reduce the probability."). Thus, the district court erred as a matter of law by holding the Center to a standard that would require showing its injuries would be completely redressed.

The district court compounded this legal error by making several impermissible factual determinations. As explained above, when standing is raised on a motion to dismiss, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009) (internal quotations omitted) (quoting *Warth,* 422 U.S. at 501). The district court, however, failed to follow this legal standard.

After citing to three facts from one page of an 87-page five-year status report on condors, the court concluded that it was likely that condors will travel outside the Kaibab "and ingest lead ammunition in the same manner as lead ingested within [Kaibab] borders." ER at 8. Based on that, the court concluded that, even if the Forest Service banned lead ammunition in the Kaibab, it is unlikely "the condor would no longer suffer from the lead poisoning that causes Plaintiffs' alleged aesthetic injury." *Id*.

Not surprisingly, given its purported effort to encourage hunters to voluntarily switch to non-lead ammunition, ER at 71–72, the Forest Service itself did not advance this argument below. By the district court's logic, the voluntary

program in Arizona would be wasted effort since the condors will likely be poisoned outside of the Kaibab anyway. Had the district court not erred in dismissing the Center's case on the pleadings, at the summary judgment stage the Center would have introduced additional facts in the form of expert testimony supporting the very conclusion the district court rejected—that eliminating the use of spent lead ammunition on the Kaibab would benefit species that live and forage there *regardless of* where those same species might otherwise be exposed to lead.

Moreover, the Complaint and supporting materials are rife with facts supporting endangerment of condors on the Kaibab National Forest.[14] From these allegations, the proper inference for the court to have drawn *in favor of the Center*, as it was required to do, was that elimination of that endangerment would reduce the risk of harm to condors and other wildlife on the Kaibab. This, in turn, would redress the Center's injuries by eliminating a direct source of harm to the very species from which they derive recreational, aesthetic, professional and

---

[14] *See, e.g.*, ER at 153 (spent lead ammunition within the Kaibab "creates complete exposure pathway"); ER at 154 (Kaibab "provides critical breeding habitat and foraging range for the Southwest condor population); ER at 155 ("Southwest condor population's blood lead levels peak during the fall deer hunting season in the Kaibab"); ER at 63 ("[A]s soon as domestic sheep [] are moved into the high country of Southern Utah in May or June, the condor population shifts to take advantage of the tremendous source of carrion followed by the lure of remains of hunted carcasses on both the Kaibab Plateau and southern Utah during the months of November and December."); ER at 162 (quoting 2007 SCRT Review) ("[The Peregrine Fund] found that an abrupt increase of blood lead levels corresponded with increased use of deer-hunting areas on the Kaibab Plateau in 2002 and thereafter.").

commercial benefits from observing, photographing and studying. ER at 16 (discussing plans to visit North Kaibab National Forest and nearby condor release site in June 2013 with hopes of witnesses and photographing condors); ER at 20 (plans to visit Tusayan Ranger District in the Kaibab in February or March of 2013 and hopes to witness and observe wildlife, including condors).

Not only did the court fail to draw the proper inference in the Center's favor, it drew an inference *against* the Center by finding it likely that elimination of spent lead ammunition on the Kaibab would not benefit individual condors or the Southwest condor population by reducing their risk of lead poisoning. Such an inference is particularly unwarranted since, as alleged in the Complaint, condors are social feeders and therefore one contaminated carcass or gut pile can poison several condors in the course of one feeding event. ER at 155. If such an acute poisoning event occurred in Kaibab, those affected condors would never have the chance to feed in other states. And given that there are only 73 wild, free-flying condors, such an event could have a significant detrimental effect on the Southwest population. Additionally, the district court only referenced condors' propensity for long distance travel. *See* ER at 8. The court did not account for allegations in the Complaint involving other wildlife at risk for poisoning on the Kaibab that do not range as far as condors. *See* ER at 151–52. While this case focuses on condors because of the scientific attention they receive and data that is available regarding

lead poisonings and mortality, they also are an indicator of spent lead ammunition exposure pathways that may endanger other wildlife species. ER at 151.

In sum, the court construed facts and drew inferences against the Center, which it was not permitted to do at the motion to dismiss stage. And the court did so without the benefit of a record, any discovery, any expert testimony, or any evidentiary hearings. The court's improper factual determinations were significant here, as they formed part of the basis for the court's finding that redressability was speculative.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Dated this 26th day of November, 2013.

Respectfully submitted,

/s/ *Allison LaPlante*
Kevin M. Cassidy (OSB 025296)
Allison LaPlante (OSB 023614)
Earthrise Law Center

Attorneys for Appellants

## STATEMENT REGARDING RELATED CASES

The undersigned, counsel of record for Appellants the Center for Biological Diversity, the Sierra Club, and Grand Canyon Wildlands Council, are aware of no pending related cases.

Dated this 26th day of November, 2013.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,046 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

Dated this 26th day of November, 2013.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 26, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated this 26th day of November, 2013.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants

# ADDENDUM

## TABLE OF CONTENTS

42 U.S.C. § 6972(a) .................................................................................. 1

42 U.S.C. § 6972

§ 6972. Citizen suits

(a) In general

Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf--

(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment; or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

Any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur. Any action brought under paragraph (a)(2) of this subsection may be brought in the district court for the district in which the alleged violation occurred or in the District Court of the District of Columbia. The district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce the permit, standard, regulation, condition, requirement, prohibition, or order, referred to in paragraph (1)(A), to restrain any person who has contributed or who is contributing to the past or present handling,

storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both, or to order the Administrator to perform the act or duty referred to in paragraph (2), as the case may be, and to apply any appropriate civil penalties under section 6928(a) and (g) of this title.

. . .