No. 13-16684

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

*Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Civil Case No. 12-8176

**BRIEF FOR THE FEDERAL DEFENDANTS-APPELLEES**

ROBERT G. DREHER
*Acting Assistant Attorney General*
*Environment & Natural Res. Division*

*Of Counsel:*

GARY FREMERMAN
STEVE HATTENBACH
*Office of the General Counsel*
*U.S. Dep't of Agriculture*

DUSTIN J. MAGHAMFAR
ALLEN M. BRABENDER
*Attorneys, U.S. Dep't of Justice*
*Environment & Natural Res. Division*
*P.O. Box 7415*
*Washington, DC 20044*
*Telephone: (202) 514-5316*
*allen.brabender@usdoj.gov*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUE ................................................................. 1

STATEMENT OF THE CASE ................................................................. 1

STATEMENT OF THE FACTS ............................................................... 2

    I.    LEGAL BACKGROUND ............................................................... 2

        A.    Resource Conservation and Recovery Act (RCRA) ........ 2

        B.    Federal Deference to State Wildlife Management ........ 4

        C.    Arizona Hunting Regulations ........................................ 7

    II.    FACTUAL BACKGROUND ............................................................. 8

        A.    Arizona's lead reduction program ............................... 10

        B.    Proceedings below ....................................................... 12

SUMMARY OF THE ARGUMENT ......................................................... 14

STANDARD OF REVIEW ...................................................................... 16

ARGUMENT ........................................................................................ 17

    I.    THE FOREST SERVICE IS NOT A FAIRLY TRACEABLE CAUSE OF THE CENTER'S ALLEGED INJURIES ............................................. 18

    II.    THE CENTER'S ALLEGED INJURIES ARE NOT LIKELY TO BE REDRESSED BY THIS LAWSUIT AGAINST THE FOREST SERVICE ................................................................................. 22

    III.    THE CENTER HAS NOT ALLEGED A VIOLATION OF ANY PROCEDURAL RIGHT OWED TO ITS MEMBERS .......................... 26

CONCLUSION ........................................................................ 31

## TABLE OF AUTHORITIES

**CASES:**

*Alaska Ctr. for Env't v. Browner,*
    20 F.3d 981 (9th Cir. 1994) ........................................... 21

*Allen v. Wright,*
    468 U.S. 737 (1984) ........................................................ 19

*Clapper v. Amnesty Int'l,*
    133 S. Ct. 1138 (2013) ............................................. 17, 25

*Covington v. Jefferson County,*
    358 F.3d 626 (9th Cir. 2004) .................................... 18, 20

*Ctr. for Law and Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ...................................... 27

*Defenders of Wildlife v. Andrus,*
    627 F.2d 1238 (D.C. Cir. 1980) .................................... 4, 6

*Fernandez v. Brock,*
    840 F.2d 622 (9th Cir. 1988) .................................... 29-30

*Fund for Animals v. Thomas,*
    932 F. Supp. 368 (D. D.C. 1996) ...................................... 4

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013) ........................................ 16

*Hinds Inv., LP v. Angioli,*
    654 F.3d 846 (9th Cir. 2011) ........................................... 3

*Kildare v. Saenz,*
    325 F.3d 1078 (9th Cir. 2003) .................................... 29-30

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976) ........................................................ 4

*Levine v. Vilsack,*
    587 F.3d 986 (9th Cir. 2009) ........................................ 30

*Linda R.S. v. Richard D.,*
    410 U.S. 614 (1973) ...................................................... 18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...............................16-17, 23, 24, 27

*Meghrig v. KFC Western, Inc.,*
    516 U.S. 479 (1996) ........................................................ 3

*Norton v. S. Utah Wilderness Alliance (SUWA),*
    542 U.S. 55 (2004) ........................................................ 29

*NRDC v. EPA,*
    542 F.3d 1235 (9th Cir. 2008) ...................................... 21

*Salmon Spawning & Recovery Alliance v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ...................................... 29

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ................................................ 17, 27

*Wilderness Society v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ...................................... 27

**STATUTES:**

Arizona Revised Statutes
    A.R.S. § 17-231 ........................................................ 7-8
    A.R.S. § 17-234 ........................................................ 7-8

Federal Land Policy and Management Act of 1976
    43 U.S.C. §§ 1701-1787 .................................................. 4
    43 U.S.C. § 1732(b) .................................................. 5, 22

Federal Lands Recreation Enhancement Act
    16 U.S.C. § 6813(a)............................................................6

Multiple Use-Sustained Yield Act
    16 U.S.C. §§ 528-531 .......................................................5

National Wildlife Refuge System Administration Act
    16 U.S.C. § 668dd(c)........................................................6

Resource Conservation and Recovery Act
    42 U.S.C. §§ 6901-92k .....................................................2
    42 U.S.C. § 6902(b).........................................................3
    42 U.S.C. § 6972(a).........................................................3
    42 U.S.C. § 6972(a)(1)(B)...............................1, 3, 12, 16

Wild and Scenic Rivers Act
    16 U.S.C. § 1284(a)........................................................6

28 U.S.C. § 1291.................................................................1
28 U.S.C. § 1331.................................................................1

**RULES and REGULATIONS:**

36 C.F.R. § 241.2............................................................6-7

36 C.F.R. § 251.10(d) .........................................................6

36 C.F.R. § 251.50(a) .........................................................6

36 C.F.R. § 251.50(c) .........................................................6

36 C.F.R. § 251.51..............................................................6

36 C.F.R. §§ 261.70 ..........................................................30

Fed. R. App. P. 4(a)(1)(B) ...................................................1

A.A.C. R12-4-303 ...........................................................7-8

A.A.C. R12-4-304 ................................................................. 7-8

**LEGISLATIVE HISTORY:**

U.S. Const. art. I § 8 cl. 17 ........................................................ 4

# JURISDICTIONAL STATEMENT

The district court had statutory jurisdiction under 28 U.S.C. § 1331, but lacked Article III jurisdiction. On July 2, 2013, the district court entered judgment in favor of United States Forest Service. *See* Excerpts of Record (ER) 1. Plaintiffs-Appellants Center for Biological Diversity, *et. al.*, ("the Center") filed a timely notice of appeal on August 21, 2013. *See* Fed. R. App. P. 4(a)(1)(B); ER 10. This Court has appellate jurisdiction under 28 U.S.C. § 1291, but lacks Article III jurisdiction.

# STATEMENT OF THE ISSUE

Does the Center lack Article III standing?

# STATEMENT OF THE CASE

In this lawsuit, the Center alleges that the use of lead ammunition by hunters in the Kaibab National Forest in Arizona is harming the California condor and other avian species that its members have an interest in viewing while recreating in the Forest. ER 143-55. To redress its alleged harm, the Center has brought a citizen suit under Section 7002 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), against the Forest Service. ER 155-56.

For its part, while the Forest Service administers the Kaibab National Forest, it is not the entity that regulates hunting in the

Forest. Rather, the State of Arizona regulates hunting in the Kaibab National Forest consistent with a long-standing federal policy of deferring regulation of hunting to the States. Moreover, as a result of Arizona's lead reduction program for the condor and with the Forest Service's encouragement and financial support, the vast majority of hunters within the condor range in northern Arizona where the Kaibab National Forest is located now use non-lead ammunition during the fall hunting season or take other measures to avoid introducing lead into the environment. ER 69-72, 75.

The Forest Service moved to dismiss the Center's lawsuit, arguing that the Center lacked Article III standing to sue the Forest Service because the agency was not a cause of the harm associated with the use of lead ammunition and, regardless, this lawsuit against the agency is unlikely to redress the harm. The district court granted the Forest Service's motion. ER 7-8. The Center appeals. ER 10.

STATEMENT OF THE FACTS

## I.     LEGAL BACKGROUND

### A.     <u>Resource Conservation and Recovery Act (RCRA)</u>

RCRA, 42 U.S.C. §§ 6901-92k, establishes a "cradle-to-grave" regulatory scheme that governs the treatment, storage and disposal of

hazardous wastes. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996); *see also Hinds Inv., LP v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011). RCRA and its implementing regulations impose detailed standards for the management and handling of hazardous wastes "so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b).

As relevant, RCRA authorizes any person who has provided the statutorily prescribed notice of intent to sue to commence a civil action

> against any person, including the United States[,] . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment

RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). This citizen suit provision also states the relief available in such an action:

> The district court shall have jurisdiction, . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both

RCRA § 7002(a), 42 U.S.C. § 6972(a).

**B.**     **Federal Deference to State Wildlife Management**

"'Without more,' federal ownership of lands within a State does not withdraw those lands from the jurisdiction of the State." *Kleppe v. New Mexico*, 426 U.S. 529, 544 (1976). "Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions." *Id.* at 545. "The common law has always regarded the power to regulate the taking of animals *ferae naturae* to be vested in the states to the extent their exercise of that power may not be incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution." *Fund for Animals v. Thomas*, 932 F. Supp. 368, 369-70 (D. D.C. 1996) (citation omitted).

While the Property Clause of the United States Constitution, U.S. Const. art. I § 8 cl.17, provides Congress with the authority to preempt state regulation of wildlife on federal lands, Congress traditionally has preserved the State's role and authority to manage wildlife on federal lands. *See Kleppe*, 426 U.S. at 545-46; *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1248-50 (D.C. Cir. 1980). This congressional deference to the States in the field of wildlife management is codified in various federal statutes, including the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-87.

FLPMA reaffirms the States' primary responsibility for the management of wildlife on federal lands, providing that "nothing in this Act shall be construed as authorizing the Secretary [of Agriculture] to require Federal permits to hunt and fish on … lands in the National Forest System." 43 U.S.C. § 1732(b). FLPMA provides the Secretary with authority to "designate areas of … lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted . . .  for reasons of public safety, administration, or compliance with provisions of applicable law." *Id.* FLPMA also requires that, except in emergencies, the Secretary consult with state fish and game departments prior to promulgating regulations closing areas to hunting and fishing. *Id.*

In addition to FLPMA, congressional deference to the States in wildlife management is also reflected in the Multiple Use-Sustained Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528-531, another statute that applies to the management of the National Forest System. MUSYA also respects the states' jurisdiction over wildlife management: "Nothing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish in

the national forests." *Id.* § 528; *see also* 16 U.S.C. § 668dd(c) (National

Wildlife Refuge System Administration Act); 16 U.S.C. § 1284(a) (Wild

and Scenic Rivers Act); 16 U.S.C. § 6813(a) (Federal Lands Recreation

Enhancement Act); *Andrus*, 627 F.2d at 1248.

Since 1941, the Forest Service regulations have directed its

officials to cooperate with state wildlife agencies to allow hunting in

"accordance with the requirements of State laws." 36 C.F.R. § 241.2.

The Forest Service's regulations do not regulate the method of hunting

or the type of ammunition used by a state-licensed hunter.

The Forest Service requires individuals or companies who engage

in commercial activities on National Forest System lands to obtain

Special Use permits. *Id.* § 251.50(a). This includes entities such as

hunting outfitters and guides who provide commercial services. *Id.* §

251.51 (defining certain terms, including "guiding" and "outfitting," but

not "hunting"). However, special use permits are not required to hunt in

any national forest, and such permits do not regulate the manner of

hunting.  36 C.F.R. § 251.50(c) ("A special use authorization is not

required for noncommercial recreational activities, such as . . .

hunting"). No Forest Service permit is required to hunt on National Forest System lands.

### C.    <u>Arizona Hunting Regulations</u>

Unlike the Forest Service, the Arizona Game and Fish Commission ("State Commission") does regulate hunting on the Kaibab National Forest and other National Forest System lands in Arizona, including the manner and methods of taking game. Among the State Commission's powers and duties is the authority to establish policies for the management, preservation and harvest of wildlife, to establish hunting, trapping and fishing rules, and to prescribe the manner and methods for taking wildlife. A.R.S. § 17-231(A)(2), (3).

The State Commission regulates all aspects of hunting in Arizona. Hunting is authorized within the National Forests in Arizona by Commission order. A.R.S. § 17-234 (State Commission shall by order open, close or alter seasons statewide or any portion of the State). The State Commission establishes by order bag and possession limits, A.R.S. § 17-234, and prescribes by rule lawful methods for taking wildlife. A.A.C. R12-4-304. The State Commission also has adopted rules specifying the types of weapons and ammunition that are authorized in taking wildlife on National Forests. *See, e.g.*, A.A.C. R12-

4-303(A). Ammunition prohibited statewide includes tracer, armor-piercing, or full-jacketed ammunition designed for military use. A.A.C. R12-4-303(A)(2). The State Commission also prohibits statewide the use or possession of lead shot for taking waterfowl. A.A.C. R12-4-304(B)(3)(d). The State Commission's rules allow any individual, organization or agency to petition the Commission to make, amend or repeal any of its rules, including the manner and methods of taking game. A.A.C. R12-4-601.

## II.    FACTUAL BACKGROUND

The Forest Service manages the land and administers the resources in the National Forest System. ER 150 ¶¶ 21-22. The Center's Complaint focuses on the Kaibab National Forest and alleges that an imminent and substantial endangerment to the environment exists there. ER 153, 155-56. The Kaibab National Forest is a popular destination for hunting deer and elk. ER 153 ¶ 33. The Center alleges that wildlife species, and in particular the California condor, are exposed to spent lead ammunition that is used and subsequently disposed of by hunters in the Kaibab National Forest. *Id.* ¶ 35. Specifically, the Center alleges that condors are exposed to spent lead ammunition in the Kaibab National Forest in two ways: 1) through

animal carcasses shot with lead ammunition but not retrieved; and 2) through remains of animals that have been field-dressed, known as "gut piles." ER 151-52 ¶¶ 28-29.

Lead is a toxin that, when ingested by condors, can cause lead poisoning, which results in adverse health effects. ER 150 ¶ 23, ER 152 ¶ 31. The Center alleges that condors suffer from lead poisoning by eating from gut piles and from animal carcasses shot, but not retrieved, in Arizona. ER 151-52 ¶¶ 27-29; ER 153-54 ¶¶ 35, 37. The Center contends that "[s]pent lead ammunition has been and continues to be the primary source of the condors' lead exposure in Arizona," ER 154 ¶ 39, and that the "condor population's blood lead levels peak during the fall deer hunting season" in the Forest. ER 155 ¶ 42.

Specifically with respect to the Forest Service, the Center contends that the agency "manages the Kaibab National Forest in northern Arizona." ER 153 ¶ 33. Further, the Center alleges that the Forest Service issues special use permits to hunting outfitters and guides, who take clients hunting in the Kaibab National Forest. *Id.* ¶ 34. The Center contends that the Forest Service "does not prohibit or restrict the use of lead ammunition within" the Kaibab National Forest

through its special use permits. *Id.* Finally, the Center notes that the "Arizona Game and Fish Department hunting regulations do not prohibit or restrict the use of lead ammunition for hunting within the Kaibab National Forest." *Id.*

## A.  Arizona's lead reduction program

While the State Commission's regulations do not prohibit or restrict the use of lead ammunition specifically to protect condors, the Arizona Game and Fish Department ("AGFD") works to reduce the amount of lead within the condor range in northern Arizona. ER 67-70. The AGFD's efforts include educating hunters on the effects of lead ammunition on wildlife, encouraging hunters to use non-lead ammunition, providing free non-lead ammunition during the big game hunting seasons, and operating a gut pile raffle to encourage the removal of lead shot gut piles from the wild by burying the piles or packing them out of the environment. ER 68-69.

The Forest Service works closely with the AGFD and other agencies in the lead reduction effort. ER 72, 75. For instance, the Kaibab National Forest requests that all permitted hunting outfitters and guides have their clients use non-lead ammunition on their hunts within condor range or take other measures to prevent lead exposure in

wildlife, such as removing or burying gut piles. *Id.* The Forest Service also assists the AGFD in distributing lead reduction information to hunters during the fall hunting season. *Id.* As a result of the AGFD's and the Forest Service's lead reduction efforts, 80 to 90% of hunters within the condor range in northern Arizona voluntarily use non-lead ammunition or pack out or bury their gut piles. ER 70.

"Although voluntary lead reduction efforts have significantly reduced the amount of lead available to condors in Arizona, the Southwest condor reintroduction program has yet to observe a corresponding reduction in condor lead exposure rates." ER 72. The Southwest Condor Recovery Team ("SCRT") attributes this lack of a result to the condor's wide range and the lack of successful lead reduction efforts in states such as Utah where condors frequently travel and forage. *Id.* While the vast majority of hunters in northern Arizona participate in lead reduction efforts, very few hunters participate in such programs in Utah and elsewhere.[1] *Id.*

---

[1] Utah's lead reduction program is discussed at ER 70-71, 84. Utah is stepping up its effort, http://wildlife.utah.gov/condors/, and the Forest Service is providing some financial support for the Utah program.

## B. Proceedings below

On September 5, 2012, the Center initiated the instant lawsuit under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), alleging that "[t]he Forest Service, by and through its authority and control over the Kaibab National Forest and the activities that occur there, has contributed and is contributing to the past or present disposal of solid or hazardous waste, which may present an imminent and substantial endangerment to health or the environment." ER 156. The Center alleged that the Forest Service was contributing to the alleged endangerment within the Kaibab National Forest: (1) "by failing to use its broad authority to stop the disposal of lead in the form of spent ammunition"; and (2) "by issuing Special Use permits for guiding and outfitting activities that do not prohibit the use of lead ammunition." *Id.* The Center sought a declaratory judgment and an order "permanently enjoin[ing] the Forest Service from creating or contributing to the creation of an imminent and substantial endangerment to human health or the environment within the Kaibab National Forest." ER 156.

The Forest Service moved to dismiss the complaint on two grounds: (1) that the court lacked Article III jurisdiction due to the Center's lack of standing; and (2) that the Center failed to plead a

cognizable claim under RCRA. ER 3. The district court granted the motion to dismiss, concluding that the Center lacked standing. ER 8.

In analyzing the standing question, the court concluded that the Center had adequately demonstrated that its members have continued recreational interests in observing and experiencing wildlife in the Kaibab National Forest that are harmed by the introduction of lead into the environment. ER 5. The court also concluded that a Forest Service "decision" to allow lead ammunition was a "but for" cause of the potential injury to the Center's interests. ER 6-7. The court concluded, however, that the Center had "failed to establish a sufficient likelihood" that its suit against the Forest Service would redress its harm. ER 8.

The court first noted it could not order the Forest Service to promulgate a regulation banning lead ammunition – the relief that the court thought the Center was requesting – because the decision whether to initiate a rulemaking is discretionary with the agency and a rulemaking would require the completion of several procedural steps that made the outcome of that process too uncertain. ER 7-8. The court further noted that the record before it demonstrated that the condor's extensive range meant that it likely would be exposed to lead in the

same manner regardless of any action it ordered the Forest Service to take. ER 8. The court thus concluded that the redressability of the Center's alleged harm in this lawsuit against the Forest Service was too speculative for the court to exercise Article III jurisdiction. *Id.*

The court did not address whether the Center had plead a legally cognizable claim under RCRA. *Id.* The court entered final judgment for the Forest Service. ER 1. The Center appealed. ER 10-11.

## SUMMARY OF THE ARGUMENT

The district court correctly held that it lacks Article III jurisdiction. For primarily two reasons, the Center has failed to demonstrate the existence of an Article III case or controversy against the Forest Service. The Center thus lacks standing to maintain this lawsuit against the Forest Service.

First, the Forest Service is not the cause of the harm that individual hunters using lead ammunition may inflict on the Center's alleged interest in observing condors in the wild. The Forest Service is not the authority that regulates hunting in the Kaibab National Forest. The Forest Service has taken no action to allow lead ammunition in the Kaibab National Forest. The agency merely defers to Arizona's (and all other States') regulation of hunting, consistent with long-standing

congressional and Executive branch policy. It is thus Arizona, which regulates hunting, and the individual hunters who use lead ammunition who are the traceable causes of the Center's injuries.

Second, even if the Forest Service were to ban the use of lead ammunition in the Kaibab National Forest, the Center has failed to show that the ban would be likely to redress its alleged harm. That is because the condor's extensive range means that the birds will travel to areas outside the Kaibab National Forest and northern Arizona and will be exposed to lead regardless of any ban imposed by the Forest Service. Indeed, the Kaibab National Forest already encourages hunters not to use lead ammunition and works with the AGFD to reduce lead levels within northern Arizona. Those efforts have resulted in a significant reduction in the amount of lead consumed by condors in Arizona. Despite this significant reduction in Arizona, there has been no observable reduction in condor lead exposure rates overall because hunters in Utah and other states continue to use lead ammunition. Accordingly, the Center cannot demonstrate that this lawsuit against the Forest Service will redress the harm that it alleges.

Despite the Center's suggestion otherwise, this suit is not a procedural rights case that lessens its burden to prove redressability. Notably, the Center never states what "procedural violation" the Forest Service allegedly has committed. The Center's complaint raises a claim for substantive relief under RCRA § 7002(a)(1)(B). To the extent that the Center's procedural rights argument is meant to suggest that the Center is seeking to compel the Forest Service to initiate Administrative Procedure Act ("APA") rulemaking procedures to promulgate a regulation banning lead ammunition, the district court correctly concluded it lacked jurisdiction to provide that relief because the decision to initiate rulemaking is discretionary with the agency.

## STANDARD OF REVIEW

This Court reviews questions of Article III standing *de novo. See Hayes v. County of San Diego*, 736 F.3d 1223, 1228 (9th Cir. 2013). The burden of establishing standing falls squarely on the party invoking federal court jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim."

*Id.* (internal quotation omitted). However, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Institute*, 555 U.S. 488, 493-94 (2009) (quoting *Lujan*, 504 U.S. at 562).

## ARGUMENT

Article III, § 2, of the United States Constitution extends the "judicial Power" of the federal courts only to "Cases" and "Controversies." At the core of Article III's case-or-controversy requirement are three inquiries that together constitute the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. Specifically, the party asserting that it has standing to invoke federal jurisdiction must show: (1) that it has "suffered an injury in fact"; (2) that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (citations and quotation marks omitted); *see also Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1146-47 (2013); *Summers*, 555 U.S. at 493. The requirements of causation and redressability together ensure that there is an appropriate nexus between the alleged injury-in-fact and the claim

for relief. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18 (1973). As the district court correctly concluded, that nexus is missing in the instant case. The Center lacks Article III standing.

## I. THE FOREST SERVICE IS NOT A FAIRLY TRACEABLE CAUSE OF THE CENTER'S ALLEGED INJURIES.

First, the Center has failed to link any of its alleged injuries to aesthetic and recreational interests in viewing condors in the wild to any decision made by, or any action being undertaken by, the Forest Service. The district court thought that the Center's alleged injuries are in part caused by the Forest Service's unidentified "decision" to allow hunters to use lead ammunition. ER 6-7. But the district court was mistaken. The Forest Service has not made any "decision" regarding lead ammunition. Rather, consistent with long-standing federal policy, the State of Arizona regulates hunting in the Kaibab National Forest. It is Arizona's regulations that permit the use of lead ammunition. It is the State of Arizona and the individual hunters using lead ammunition who are the traceable causes of the Center's alleged harm.[2]

---

[2] As this Court explained in *Covington v. Jefferson County*, the existence of, or lack of, Article III standing is not to be confused with the analysis required under RCRA. *See* 358 F.3d 626, 639 (9th Cir. 2004). Even if the Center properly had alleged its standing to sue, that would have no bearing on its entitlement to injunctive relief under RCRA § 7002, as

In cases, such as here, where a chain of causation "involves numerous third parties" whose "independent decisions" collectively have a "significant effect" on plaintiffs' injuries, the causal chain is too weak to support standing at the pleading stage. *See Allen v. Wright*, 468 U.S. 737, 759 (1984). Here, lead poisoning in condors is the result of the actions of numerous third parties not before the Court. Most notably, lead enters the environment in the Kaibab National Forest through the independent decisions of the relatively few hunters who use lead ammunition while hunting in the Forest. As noted, up to 90% of hunters within the condor range in northern Arizona choose not to use lead ammunition or they bury or pack out their gut piles. ER 70. These voluntary actions are the result of significant lead reduction efforts by the AGFD with assistance from the Forest Service. ER 67-70, 75. With respect to hunters who choose to use lead ammunition, it is Arizona's hunting regulations that allow those hunters to use lead ammunition

the Center also recognizes. *See* Center Br. at 25 ("causation 'need not be so airtight [on a motion for summary judgment] as to demonstrate that plaintiffs would succeed on merits.'"). The Forest Service asked the district court below to dismiss the complaint on the additional ground that the Center failed to state a cognizable claim under RCRA § 7002, but the court did not reach that question because it concluded that the Center lacked standing. ER 8. The Center did not include the RCRA issue in its brief, so neither do we.

while hunting in the Kaibab National Forest, not any action or decision by the Forest Service. Under circumstances such as these, where the AGFD's and the Forest Service's efforts have "significantly reduced" the amount of lead accessible to condors within the northern Arizona (ER 72), the Center has failed to demonstrate that its alleged injuries to aesthetic and recreational interests in viewing condors in the wild is fairly traceable to its allegation that the Forest Service has not exercised some remaining discretionary authority.

None of the cases on which the Center relies save the Center from its failure to demonstrate that the Forest Service is a cause of their alleged harm. This case is unlike *Covington v. Jefferson County*, 358 F.3d 626 (9th Cir. 2004). There, the District 7 Health Department, the regulatory agency being sued, was in fact the agency exercising regulatory authority over the landfill and, importantly, the particular subject matter at issue. 358 F.3d at 639. The Forest Service is not in a similar position here. The Forest Service is not the agency that, in fact, regulates hunting in the Kaibab National Forest. The Forest Service thus is not a traceable cause of the Center's alleged injuries.

In further support of its causation theory, the Center relies on *NRDC v. EPA*, 542 F.3d 1235, 1248 (9th Cir. 2008). But in that case it was alleged that the EPA had violated a non-discretionary duty under the Clean Water Act to regulate the construction industry by promulgating certain guidelines and standards. 542 F.3d at 1244. The Court concluded that the EPA's alleged failure to fulfill that non-discretionary regulatory duty was a fairly traceable cause of the plaintiffs' injuries that an order to issue those guidelines and standards potentially could redress, even though it could not be determined what the outcome of the rulemaking process would be. *Id.* at 1246. The Court thus found that the EPA was a traceable cause of the harm because the agency had failed to fulfill a regulatory duty that Congress mandated. The Center's reliance on *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994) (*ACE*), is likewise unavailing, because, there too, the EPA had a non-discretionary duty to promulgate regulations.

Unlike those cases, the Forest Service does not possess a non-discretionary duty to regulate hunting or prohibit lead ammunition, and the Center has not identified any non-discretionary duty that the Forest Service has failed to perform. The lack of any allegation that the Forest

Service has failed to comply with a non-discretionary duty places the Forest Service in a much different position than that of EPA in *NRDC* and *ACE*. The Center identifies no case where an agency's deference to a congressional policy was found to be a traceable cause of the alleged harm that was sufficient to confer standing, in the absence of a non-discretionary duty to take action. Far from conferring a non-discretionary duty on the Forest Service, Congress has repeatedly left the primary authority to regulate hunting on federal lands with the States consistent with common law and long-standing federal policy. *See* 43 U.S.C. § 1732(b) ("nothing in this Act shall be construed as authorizing the Secretary [of Agriculture] to require Federal permits to hunt and fish on … lands in the National Forest System."). The Forest Service's mere acquiescence in a congressional policy of deference to state-issued hunting regulations is too tenuous and remote a cause of the Center's alleged harm to confer Article III jurisdiction on this Court.

## II. THE CENTER'S ALLEGED INJURIES ARE NOT LIKELY TO BE REDRESSED BY THIS LAWSUIT AGAINST THE FOREST SERVICE.

Even if the Center had adequately alleged a particularized injury that is caused by the Forest Service, that injury could not be sufficiently redressed by a decision in its favor here. To satisfy the redressability

component of standing, a plaintiff must allege facts showing that it is "*likely*, as opposed to merely speculative, that the injur[ies] will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal citations and quotation marks omitted, emphasis added). As the district court correctly concluded (ER 8), "the behavior and feeding habits of the California condor and other avian species make it unlikely that even if [the Forest Service] were to ban lead from being discarded within the [Kaibab National Forest], the condor would no longer suffer from lead poisoning that causes [the Center's] alleged aesthetic injury."

The district court was correct. As the Southwest Condor Recovery Team ("SCRT") states, "[c]ondors of the southwest population are known for long distance travel with the longest trips recording wide arching loops into eastern Nevada, southwestern Arizona, east . . . to the New Mexico border, and north as far as . . . Wyoming." ER 63. Thus, condors that visit the Kaibab National Forest also visit and feed outside its borders and thus outside of the areas managed by the Forest Service and regulated at least for hunting purposes by Arizona. The Center does not allege that lead ammunition is banned or otherwise regulated in any of these areas where the condors would visit and forage.

Notably, as a result of Arizona's lead reduction program, up to 90% of hunters within the condor range in northern Arizona use non-lead ammunition or pack out or bury their gut piles. ER 68-70. The Center identifies no evidence that an outright ban on lead ammunition in the Kaibab National Forest would be likely to reduce lead levels further.[3] ER 73, 93. In fact, despite the significant reduction in lead accessible to condors in Arizona as a result of the voluntary program, there has been no corresponding reduction in condor lead exposure rates. ER 72. The SCRT attributes this lack of a result to the absence of successful lead reduction efforts in states such as Utah that condors also frequent. *Id.* Accordingly, because of the condor's extensive range, those birds that visit the Kaibab National Forest would be detrimentally exposed to lead even if the Forest Service banned lead ammunition in that Forest. The Center's pleadings thus have failed to demonstrate that its alleged harm is likely to be redressed.[4]

---

[3] The SCRT recommends against banning lead ammunition in Arizona and Utah because the effectiveness of outright bans is inconclusive and because the bans create considerable tension between the condor recovery program and the hunting community. ER 73, 92-93.

[4] As the Center acknowledges (at 19), causation and redressability are "two sides of the same coin." Accordingly, the great success of the lead

The Center responds (at 46-50) that reduction of a known risk satisfies redressability. But the Center's assertion that there would be a reduction in risk is too speculative to satisfy Article III. Article III is concerned with actual cases and controversies. *See Clapper*, 133 S.Ct. at 1146 ("[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies"). Where the Center cannot demonstrate that its lawsuit against the Forest Service likely will result in any reduction of its harm, there is no Article III case or controversy between the Center and the Forest Service in the Kaibab National Forest. *See Lujan*, 504 U.S. at 571 (finding redressability lacking where agencies supplied only a fraction of funds for project with no hint project would be suspended if that fraction was eliminated).

To reach this conclusion, the Court need not draw inferences against the Center. Rather, it is the Center's own pleadings and supporting materials that demonstrate the unduly speculative nature of its allegations. To make its allegations of causation and redressability,

---

reduction program in northern Arizona and the corresponding lack of success in places such as Utah are not only reasons why the Center's alleged harm is not redressable by this lawsuit, but also reasons why the Forest Service is not a cause of the alleged harm.

the Center's complaint relies on the SCRT's 2012 Report. ER 154-55

(citing ER 51-142). However, the SCRT's 2012 Report establishes that

any harm the Center may be suffering is unlikely to be redressed by

this lawsuit. As the Center's own supporting documents demonstrate

(ER 72), this lawsuit is unlikely to redress the Center's alleged harms.

## III. THE CENTER HAS NOT ALLEGED A VIOLATION OF ANY PROCEDURAL RIGHT OWED TO ITS MEMBERS.

Apparently recognizing the insufficiency of its complaint and

supporting materials on the causation and redressability prongs of the

standing inquiry, the Center attempts (at 40-41, 45) to classify its

substantive RCRA claim as one alleging a "procedural violation." The

Center then suggests that, because this case purportedly involves a

"procedural violation," the Center has a "lesser burden" with respect to

demonstrating causation and redressability. The Center is mistaken.

First, the Center is incorrect that the causation requirement for

standing is relaxed in procedural rights cases. The "redressability and

immediacy" requirements are relaxed, not the causation requirement.

*See Lujan*, 504 U.S. at 572 n.7; *see also Ctr. for Law and Educ. v. Dep't*

*of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege

injury resulting from violation of a procedural right afforded to them by

statute and designed to protect their threatened concrete interest, the courts relax – while not wholly eliminating – the issues of imminence and redressability, but not the issues of injury in fact or causation."). The Center appears to be relying on cases that misconstrue *Lujan*.

Second, this case does not concern procedural rights. The Center has not alleged that the Forest Service deprived it of any procedural right owed to its members. Tellingly, the Center's brief does not identify any procedure that it contends the Forest Service failed to provide or how providing that procedure might redress its purported injuries. A procedural right arises where a "person . . . has been accorded a procedural right to protect his concrete interests" such as a hearing before, or ability to comment on, government action. *See Lujan*, 504 U.S. at 572-73; *see also Summers*, 555 U.S. at 496-97; *Wilderness Society v. Rey*, 622 F.3d 1251, 1258 (9th Cir. 2010). RCRA § 7002 does not provide a procedural right to citizens. It is substantive in nature. Thus, this Court should reject the Center's attempt to lower its burden for establishing its standing by reclassifying its lawsuit from one seeking a substantive remedy under RCRA § 7002 to one seeking to vindicate some unidentified procedural right.

Finally, to the extent that the Center's procedural rights argument is meant to suggest that the Center is seeking to compel the Forest Service to promulgate a regulation banning lead ammunition, despite its assertions on appeal to the contrary, the district court correctly concluded it lacked jurisdiction to provide that relief. ER 7-8.

The Center, on the one hand, asserts that the district court misunderstood the relief that it seeks. The Center argues it is not seeking to compel the Forest Service to promulgate a regulation banning lead ammunition. The Center asserts (at 29, 34) that it is instead seeking a "general directive" "ordering the Forest Service to stop the [alleged] endangerment," and states that the courts must leave "the details of *how* the Forest Service is to achieve compliance with RCRA to the discretion of the agency." But then, the Center pivots to argue that the considerable uncertainty as to whether this lawsuit will redress its alleged harm is of no obstacle to its standing because it has alleged a procedural violation that lessens its burden. The Center never clarifies what "procedural violation" the Forest Service has committed, but it appears the Center means that the agency has violated the law by

failing to initiate rulemaking under the APA and seeks to compel the agency to promulgate a regulation banning lead ammunition.

As the district court recognized (ER 7-8), however, courts are only empowered to compel regulatory agencies to perform non-discretionary duties. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63-64 (2004) (*SUWA*). Thus, the Center is incorrect that *SUWA* is "irrelevant" because that case concerns a non-discretionary duty lawsuit under APA § 706(1). While this is not an APA § 706(1) lawsuit, *SUWA* is relevant here because it recites and applies the established principle that courts cannot compel agencies to perform wholly discretionary duties – whether pursuant to APA § 706(1) or under traditional equitable powers.[5] *Id.*; *see also Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003) ("Mandamus is an extraordinary remedy and is available to

---

[5] *SUWA* also demonstrates the judiciary's reluctance to exercise jurisdiction over Executive branch policy decisions in the absence of an agency's failure to comply with a non-discretionary duty. Where the duty is discretionary, courts do not interfere in policy choices. *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227-28 (9th Cir. 2008) (finding a lack of standing where agencies had discretion to renegotiate a treaty); *Fernandez v. Brock*, 840 F.2d 622, 626-28 (9th Cir. 1988) (finding a lack of standing where agencies had discretion to promulgate regulations); *Levine v. Vilsack*, 587 F.3d 986, 994 & n.8 (9th Cir. 2009) (finding outcome of agency's discretionary rulemaking process to be too speculative to redress plaintiffs' injuries).

compel a federal official to perform a duty only if . . . the official's duty is nondiscretionary, ministerial"). The Center recognizes this principle (at 38 n.9) when it states "APA § 706(1) was based on the concept of mandamus suits." Thus, as the Court's analysis in *SUWA* demonstrates, courts have the power to compel regulatory agencies to perform only non-discretionary duties, 542 U.S. at 63-64, and then only to to perform those duties "without directing *how* [the agency] shall act," 542 U.S. at 64 (citations and quotations deleted).

The only source of the Forest Service's rulemaking authority that the Center identifies is discretionary. *See* 36 C.F.R. §§ 261.70 ("the Chief [of the Forest Service], and each Regional Forester, to whom the Chief has delegated authority, *may* issue regulations") (emphasis added)). The Center identifies no non-discretionary duty to promulgate regulations. Accordingly, the Center's alleged "procedural violation" of not initiating an APA rulemaking is not redressable because the courts cannot order the Forest Service to promulgate a regulation, where the Forest Service does not have a ministerial and mandatory duty to do so.

In the end, whatever the relief the Center seeks, the district court correctly concluded that the Center lacks Article III standing.

# CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

*/s/ Allen M. Brabender*
ROBERT G. DREHER
*Acting Assistant Attorney General*
*Environment & Natural Res. Division*

DUSTIN J. MAGHAMFAR
ALLEN M.BRABENDER
*Attorneys, U.S. Dep't of Justice*
*Environment & Natural Res. Division*
*P.O. Box 7415*
*Washington, DC 20044*
*Telephone: (202) 514-5316*
*allen.brabender@usdoj.gov*

JANUARY 2014
DJ # 90-7-3-19583

## STATEMENT OF RELATED CASES

Counsel for the United States is unaware of any currently pending cases within the meaning of Local Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) this brief is proportionately spaced, has a typeface of 14 points or more and contains 6,309 words.  I used Microsoft Word 2007.

*/s/ Allen M. Brabender*
ALLEN M. BRABENDER
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415 (Ben Franklin Station)
Washington, DC 20044
Telephone: (202) 514-5316
allen.brabender@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Allen M. Brabender*
ALLEN M. BRABENDER
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
Telephone: (202) 514-5316
allen.brabender@usdoj.gov