No. 13-16684

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*

Appellants,

v.

UNITED STATES FOREST SERVICE,

Appellee.

On Appeal from the United States District Court for the District of Arizona,
No. CV-12-8176-PCT-SMM

**BRIEF OF AMICI CURIAE NATIONAL SHOOTING SPORTS
FOUNDATION, INC., SAFARI CLUB INTERNATIONAL, AND
NATIONAL RIFLE ASSOCIATION OF AMERICA IN SUPPORT OF
APPELLEE UNITED STATES FOREST SERVICE AND IN SUPPORT OF
AFFIRMANCE OF THE JUDGMENT BELOW**

Norman D. James (AZ Bar No. 06901)
Fennemore Craig, P.C.
2394 E. Camelback Road,
Suite 600
Phoenix, AZ 85016-3429
Telephone:  (602) 916-5000
njames@fclaw.com
Attorneys for Amicus Curiae National
Shooting Sports Foundation, Inc.

Michael T. Jean (MI Bar No. P76010)
NRA/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1158
mjean@nrahq.org
Attorney for Amicus Curiae National
Rifle Association of America

Douglas S. Burdin (D.C. Bar No.
434107)
Anna M. Seidman (D.C. Bar No.
417091)
Safari Club International
501 2nd Street NE
Washington, D.C. 20002
Telephone:  (202) 543-8733
dburdin@safariclub.org
aseidman@safariclub.org
Attorneys for Amicus Curiae Safari
Club International

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 29(c)(1), amicus curiae National Shooting Sports Foundation, Inc. ("NSSF") submits the following Corporate Disclosure Statement.

NSSF is a non-profit trade association incorporated in Connecticut. NSSF has no stock, is not publicly traded, and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

DATED this 6th day of February, 2014.

*s/ Norman D. James*
Norman D. James (AZ Bar No. 06901)
Attorney for National Shooting Sports Foundation, Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(c)(1), amicus curiae Safari Club International ("Safari Club") submits the following Corporate Disclosure Statement.

Safari Club is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code. Safari Club is not publicly traded and has no parent corporation. There is no stock issued, so there is no publicly held corporation that owns 10 percent or more of its stock.

DATED this 6th day of February, 2014.

*s/ Douglas S. Burdin*
Douglas S. Burdin (D.C.
Bar No. 434107)
Attorney for Safari Club
International

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(c)(1) & 26.1(a), amicus curiae the National Rifle Association of America ("NRA") submits the following Corporate Disclosure Statement.

NRA is a not-for-profit membership association incorporated in New York. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

DATED this 6th day of February, 2014.

*s/ Michael T. Jean*
Michael T. Jean (MI Bar No. P76010)
Attorney for National Rifle
Association of America

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..................................................................v

STATEMENT OF INTERESTS OF AMICI CURIAE ...........................................1

INTRODUCTION ........................................................................5

ARGUMENT ............................................................................6

I.    This Court May Uphold The District Court's Dismissal Whether
      Causation, Redressability, Or Both Are Lacking. ...............................6

II.   Appellants' Alleged Injuries Are Not Caused By The Forest Service ............8

III.  Appellants Have Not Shown That Their Alleged Injuries Will Be
      Redressed By A Favorable Decision. ..........................................11

      A.    Redressability Depends On The State Of Arizona's Cooperation
            In Regulating Hunting In The Kaibab National Forest ....................12

      B.    There Is No Assurance That The Alleged "Endangerment"
            Would Be Remedied By Restrictions On Hunting. .........................17

      C.    The Uncertainty Inherent In The Process By Which The Forest
            Service Would Regulate Hunting In The Kaibab Precludes
            Redressability. .......................................................22

      D.    The District Court Did Not Err In Relying On *SUWA* To
            Support Its Standing Determination ....................................26

CONCLUSION ..........................................................................30

CERTIFICATE OF COMPLIANCE ...........................................................31

CERTIFICATE OF SERVICE ..............................................................32

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGES**

*Alaska Ctr. for the Envt. v. Browner*, 20 F.3d 981 (9th Cir. 1994) ......................................................................................16, 17, 25, 25 n. 7

*Allen v. Wright*, 468 U.S. 737 (1984) ...................................................................7

*Animal Legal Defense Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) ...................................................................................................25 n. 6

*Assoc. Vessels Services, Inc. v. Verity*, 688 F. Supp. 13 (D. D.C. 1988) ........... 7-8

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ...............................7

*Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107 (D.C. Cir. 1990) ..............25 n. 6

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167 (2000)..................................................................................11, 21

*Gonzalez v. Gorsuch*, 688 F.2d 1263 (9th Cir. 1982)..........................................20

*Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217 (10th Cir. 2008)..............7

*Hinds Inv., LP v. Angioli*, 654 F.3d 846 (9th Cir. 2011) ........................................5

*Kleppe v. New Mexico*, 426 U.S. 529 (1976)...........................................11, 12, 14

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ............................................20, 21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................6, 8, 11, 15, 16

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) ............................................5

*Nat'l Fed. of Indep. Businesses v. Sebelius*, 132 S.Ct. 2566 (2012) ......................9

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003)................14

*Natural Res. Def. Council v. EPA*, 542 F.3d 1235 (9th Cir. 2008) ................................................................23, 24, 24 n. 5, 25, 26

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ........ 13, 26, 27-28, 28

v

*Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007) ............................................................26, 27

*Or. Natural Desert Ass'n v. Bur. of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2008)...........................................................................27

*Price v. U.S. Navy*, 39 F.3d 1011 (9th Cir. 1994)..........................21 n. 4

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...................10

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .....................8, 10, 11

*Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013)..........................20, 21

*U.S. v. Lopez*, 514 U.S. 549 (1995) ........................................9

*Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012) .......................26, 27

*Wash. Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013)............................7

*Wyo. Farm. Bur. Fed. v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) ......................18

## FEDERAL STATUTES

**Administrative Procedure Act, 5 U.S.C. § 551, *et seq.***

5 U.S.C. § 553........................................................................23

5 U.S.C. § 706(1) ...................................................................26

5 U.S.C. § 706(2) ...................................................................26

**Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531**

16 U.S.C. § 528......................................................................13

16 U.S.C. §§ 528-531 .............................................................13

**Wilderness Act, 16 U.S.C. §§ 1131-1136**

16 U.S.C. § 1133(d)(7) ...........................................................13

**Endangered Species Act, 16 U.S.C. §§ 1531-1544**

16 U.S.C. § 1539(j) ...................................................................18

**Internal Revenue Code, 26 U.S.C. § 1, *et seq.***

26 U.S.C. § 501(c)(3) ...................................................................3

26 U.S.C. § 501(c)(4) ...................................................................2

**National Environmental Policy Act, 42 U.S.C. §§ 4321-4370(h)**

42 U.S.C. §§ 4321-4370h ............................................................23

**Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.***

42 U.S.C. § 6901 *et seq.* ............................................................1

42 U.S.C. § 6972(a) ...................................................................5

42 U.S.C. § 6972(a)(1)(B) ............................................5, 21 n. 4, 28, 29

**Federal Land Policy and Management Act, 43 U.S.C. § 1701, *et seq.***

43 U.S.C. § 1701 .......................................................................13

43 U.S.C. §§ 1701-1787 .............................................................13

43 U.S.C. § 1732(b) ..........................................................13, 13 n. 1

43 U.S.C. § 1782(c) ...................................................................28

**Other**

16 U.S.C. § 1604(i) ...................................................................23

<u>**STATE STATUTES**</u>

A.R.S. § 17-102 .......................................................................14

A.R.S. § 17-231(A) ...................................................................15

## FEDERAL REGULATIONS

36 C.F.R. § 220.4 ..................................................................................23

36 C.F.R. § 241.1(a) ..............................................................................14

36 C.F.R. § 241.2 ............................................................................14, 17

36 C.F.R. § 261.50 ................................................................................23

36 C.F.R. § 261.58 ................................................................................23

36 C.F.R. § 261.70(a)(4) ........................................................................23

50 C.F.R. § 17.81(d) ..............................................................................19

50 C.F.R. § 17.84(j) ...............................................................................18

50 C.F.R. § 17.84(j)(4)(ii) ...............................................................19-20

## STATE REGULATIONS

A.A.C. R12-4-303 ................................................................................15

A.A.C. R12-4-304(B)(3)(d) ...........................................................15 n. 2

## OTHER

61 Fed. Reg. 54044 ...............................................................................18

61 Fed. Reg. 54049 ...............................................................................18

61 Fed. Reg. 54050 ..........................................................................19, 20

61 Fed. Reg. 54052 ...............................................................................19

61 Fed. Reg. 54053 ..........................................................................19, 20

61 Fed. Reg. 54054-55 ..........................................................................19

61 Fed. Reg. 54055 ...............................................................................19

Fed. R. App. P. 29(a) ...............................................................................4

**STATEMENT OF INTERESTS OF AMICI CURIAE**

National Shooting Sports Foundation, Inc. ("NSSF"), Safari Club International ("Safari Club"), and the National Rifle Association of America ("NRA") each have a direct and substantial interest in this case. Appellants assert that the use of traditional lead ammunition for hunting must be regulated as the disposal of a hazardous waste under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* *See* Appellants Center for Biological Diversity *et al*. Excerpts of Record ("ER") 156-57 (Compl. at ¶¶ 45-47). While Appellants' claim in this case is limited to hunting on the Kaibab National Forest, a finding that lead ammunition, lawfully discharged but not retrieved or recovered, violates RCRA will be far-reaching and extend to any land on which hunting and related recreational activities take place, regardless of its ownership.

NSSF is the trade association for the firearms and ammunition industry, and its members will be directly and adversely impacted by the outcome of this litigation. NSSF has more than 8,000 members including federally-licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting-related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; publishers; and individual recreational target shooters and hunters. *See*, District Court Civil Docket ("CD") 55 at ¶ 5 (Declaration of Lawrence Keane).

Approximately 95% of the domestically manufactured ammunition is traditional ammunition made with lead bullets or shot, and over 90% of that domestically manufactured traditional ammunition is manufactured by NSSF members. *See id.* at ¶ 7. Restrictions on the use of traditional ammunition for hunting on even just National Forest System land would injure NSSF's member manufacturers, who would suffer economic harm resulting from prohibitions on the use of their products. *See id.* at ¶¶ 8-11. Consequently, NSSF and its members have a direct and substantial interest in the subject matter of this appeal, which is aimed at transforming recreational hunters into hazardous waste generators and traditional lead ammunition into a hazardous waste regulated under RCRA.

Safari Club is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code and has its principal offices and place of business in Tucson, Arizona. It has over 50,000 members from the United States and many countries around the world. *See* CD 30 at ¶¶ 3-4 (Declaration of Rew Goodenow). It has tens of thousands of members throughout the country who hunt innumerable species, including the species and location at issue in this case. *Id.* at ¶¶ 7-8. Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. *Id.* at ¶ 5.

Safari Club carries out its conservation mission through its sister organization, Safari Club International Foundation ("SCIF"). SCIF is a non-profit corporation, incorporated in the State of Nevada, operating under § 501(c)(3) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona. Its missions include funding and managing worldwide programs dedicated to wildlife conservation, and providing outdoor education and humanitarian services. *Id.* at ¶ 6.

In addition to litigation efforts generally regarding hunting, conservation, federal lands, and endangered species, including one case involving the use of lead ammunition in the Arizona Strip area and two cases involving the use of lead ammunition nationwide, Safari Club has commented to the California Fish and Game Commission regarding condors and lead ammunition. *Id.* at ¶¶ 9 (describing litigation efforts), 10 (describing comments to Commission). Ending the use of traditional lead ammunition will affect Safari Club members who hunt in the Kaibab National Forest and the organizational interests of Safari Club.

NRA is a not-for-profit membership organization that was incorporated in New York in 1871, with its principal offices in Fairfax, Virginia. CD 29 at ¶ 2 (Declaration of Chris W. Cox). Today, the NRA's membership includes over four million individuals, many of whom reside in Arizona. *Id*. One of NRA's key functions is to preserve the tradition of hunting by protecting it from unreasonable

and unnecessary restrictions. Article II, Section 5 of the NRA Bylaws states that the NRA is "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources." *Id*. at ¶ 3. NRA has represented the interests of hunters in Arizona and other states by sponsoring pro-hunting legislation and referenda, as well as challenging unreasonable anti-hunting laws and regulations. *Id*. at ¶¶ 4-8. NRA members hunt in the Kaibab National Forest with traditional lead ammunition. *See* CD 35 at ¶¶ 11-15 (Declaration of Michael John Rusing). If Appellants are successful in this matter NRA members will be deprived of their ability to hunt with traditional ammunition in the Kaibab National Forest. Thus the NRA and its members have a direct and significant interest in the outcome of this litigation.

Amici curiae file this brief pursuant to Fed. R. App. P. 29(a). All parties have consented to its filing.

This brief was not authored in any part by counsel for a party to this matter. Neither a party nor counsel for a party contributed money to fund preparation of this brief. No person—other than amici curiae and their members—contributed money to fund preparation or submission of this brief.

**INTRODUCTION**

RCRA regulates the treatment, storage, transportation and disposal of solid and hazardous wastes. *Meghrig v. KFC Western*, *Inc.*, 516 U.S. 479, 483 (1996); *see also Hinds Inv., LP v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011). RCRA Section 7002(a)(1)(B) authorizes a citizen suit against an entity that has "contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ." 42 U.S.C. § 6972(a)(1)(B). RCRA vests courts with jurisdiction to restrain the entity from such contributions and/or to order the entity "to take such other action as may be necessary . . . ." 42 U.S.C. § 6972(a).

Appellants allege that the Forest Service has contributed and is contributing to the past or present disposal of solid or hazardous waste that may present an imminent and substantial endangerment in violation of Section 7002(a)(1)(B) because the Forest Service (1) has failed to stop the "disposal" of lead in the form of spent lead ammunition within the Kaibab National Forest and (2) permits "guiding and outfitting activities that do not prohibit the use of lead ammunition within the Kaibab." *See* ER at 156-57 (Compl. at ¶¶ 45-47).

The Forest Service moved to dismiss this suit for lack of Article III standing or alternatively for failure to state a claim. ER at 3 (Memo. Dec. & Order). Amici

NSSF, Safari Club, and the NRA moved to intervene. *See* CD 28, 54. Before any ruling on the motions to intervene, the district court granted the Forest Service's motion to dismiss on the ground that Appellants lacked standing because they were unable to show that the relief they seek would likely redress their alleged injuries. ER at 7-8. Appellants subsequently filed the instant appeal, contesting the district court's ruling that they lack standing. *See id.* at 10-11 (Notice of Appeal).

## ARGUMENT

The "irreducible constitutional minimum" of standing consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent;" (2) "a causal connection between the injury and the conduct complained of;" and (3) that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 560-61 (citations omitted). Because the causation and redressability elements are not satisfied here, the district court correctly dismissed this suit for lack of standing.

## I. This Court May Uphold The District Court's Dismissal Whether Causation, Redressability, Or Both Are Lacking.

Although the district court dismissed this case based on lack of redressability, this Court must independently satisfy itself that all the elements of standing exist. Even if the district court erred in dismissing for lack of redressability, the dismissal must be upheld if this Court determines that standing

is otherwise defective, e.g., if causation is lacking. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also of the lower courts in a case under review, even if the parties are prepared to concede it. And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it." (internal quotation marks omitted)). Likewise, if redressability is lacking for a reason other than those stated by the district court, the dismissal must be upheld. *See id.*

Although Appellants appear to conflate the causation and redressability requirements (*see* Ctr. Br. at 14-15), the requirements are separate and are not identical—they "are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013) (citation omitted); *see also Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984) (observing that "it is important to keep the inquiries separate . . . ."); *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1224 (10th Cir. 2008) ("Although causation and redressability are often closely related, the twin requirements remain distinct and must be separately met . . . ."); *Assoc. Vessels Services, Inc. v. Verity*, 688 F. Supp. 13, 28 n. 25 (D. D.C. 1988)

(noting similarity between causation and redressability but holding that each must be independently satisfied where, as here, redress of the harm requires action by a third party with discretion and thus requires "more than merely the action of the" defendant).

In short, this Court should analyze these elements separately and uphold the dismissal of Appellants' complaint, whether for lack of causation, lack of redressability, or on both grounds.

## II. Appellants' Alleged Injuries Are Not Caused By The Forest Service.

Appellants have not alleged facts that demonstrate that the Federal Appellees (*i.e.,* the Forest Service) caused their alleged injuries to viewing wildlife, in particular condors, in the Kaibab National Forest. *See Defenders of Wildlife*, 504 U.S. at 560 (party seeking to invoke court's jurisdiction must show that the injury is fairly traceable to the challenged action of the defendant). Federal Appellees have already demonstrated that the courts lack jurisdiction over this case due to lack of causation. Joint Amici here address two points: (1) the impact of finding the Forest Service "caused" alleged injuries arising from the use of lead ammunition in the Kaibab National Forest and (2) that *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) does not support Appellants' inaction theory of causation.

As explained in this brief and the Federal Appellees' brief, the Forest Service's authority to regulate the use of lead ammunition is at most discretionary and deference to the state's authority in regulating the harvesting of wildlife is widely recognized in federal statutes and the case law. Appellants appear to argue that the Forest Service is nonetheless *obligated* to stop the use of lead ammunition and its failure to do so causes all injuries alleged to arise from that use. Appellants' causation theory is flawed for all the reasons explained by the Federal Appellees. In addition, a holding in agreement with the Appellants' theory would create extensive potential liability for the federal government under RCRA (and likely a host of other statutes).

The federal government has broad powers not only under the Property Clause, but in particular under the Commerce Clause. *See U.S. v. Lopez,* 514 U.S. 549, 557-58 (1995) (Congress' power to regulate commerce is broad, but not unlimited); *Nat'l Fed. of Indep. Business v. Sebelius,* 132 S.Ct. 2566, 2600 (2012) ("Once we recognize that Congress may regulate a particular decision under the Commerce Clause, the Federal Government can bring its full weight to bear. Congress may simply command individuals to do as it directs."). Under Appellants' theory, the federal government could be liable in any situation in which a government agency, whether operating under the Property Clause or Commerce Clause, has discretionary authority to act to stop a potential

endangerment under RCRA by regulating a third party, but fails to. The district court's holding further highlights this possible impact. "Although Defendant may choose not to ban certain types of ammunition in deference to Arizona's regulation of hunting, it is not thereby automatically relieved of its affirmative duty to stop the disposal of environmental contaminants in the [Kaibab]." ER at 6. Under this theory, the authority to act, even in the absence of an obligation to act, amounts to liability under RCRA. The standing doctrine cannot be stretched so far.

Appellants also overstate the Supreme Court's holding in *Steel Co.* concerning causation. The Appellants assert that "[t]o satisfy the causation element of constitutional standing, plaintiffs must show that their injury is 'fairly traceable' to the acts *or omissions* of the defendant." Ctr. Br. at 24-25 (emphasis added), citing *Steel Co.*, 523 U.S. at 103. But *Steel Co.,* in laying out the standing test, does not generally discuss a defendant's omission as causing an injury: "Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103 (citing *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)). The case involved an alleged informational injury caused by a failure to provide information the plaintiffs claimed the defendant was obligated to provide by the statute at issue. The Supreme Court did not reach the issue of whether the company's failure to provide information could give rise to informational standing,

as the Court held the plaintiffs failed to demonstrate redressability. *Id.* at 104-10.

*Steel Co.* does not support the proposition at issue here, whether the inaction of the

Federal Appellees, in the absence of a mandatory obligation to act to stop the use

of lead ammunition in the Kaibab National Forest, causes the alleged injuries to

Appellants.

**III.  Appellants Have Not Shown That Their Alleged Injuries Will Be Redressed By A Favorable Decision.**

Appellants also have failed to allege facts that show that it is *likely* that their

injury will be redressed by an order granting their requested relief. *See Friends of*

*the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Where redressability

> depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*See Defenders of Wildlife*, 504 U.S. at 562 (citations and internal quotations

omitted).  As explained below and in the Federal Appellees' opposition brief,

Appellants have not alleged facts demonstrating that their alleged injuries are

likely to be redressed in this case.

**A.    Redressability Depends On The State Of Arizona's Cooperation In Regulating Hunting In The Kaibab National Forest.**

As an initial matter, Appellants greatly exaggerate the Forest Service's ability to regulate hunting within the Kaibab National Forest, contending that the Forest Service possesses the unilateral ability to redress their injuries. Appellants' error on this point begins with their reliance on *Kleppe v. New Mexico*, 426 U.S. 529 (1976), for the proposition that Congress has "complete power" over public lands, state law notwithstanding. *See* Ctr. Br. at 10, 25. This is erroneous.

*Kleppe* actually narrowly holds that the Wild Free-roaming Horses and Burros Act "merely overrides the New Mexico Estray Law insofar as it attempts to regulate federally protected animals." *Kleppe,* 426 U.S. at 545. At the same time, the Court was careful to explain that in the absence of specific legislation, a state "retains jurisdiction over federal lands within its territory." *Id.* at 543. The Court also explained:

> The Federal Government does not assert exclusive jurisdiction over the public lands in New Mexico, and the State is free to enforce its criminal and civil laws on those lands. But where those state laws conflict with the Wild Free-roaming Horses and Burros Act, or with other legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede.

*Id.* (citation omitted). Thus, the Court recognized that states retain jurisdiction over federal land, including national forests, unless and until Congress has enacted legislation that specifically overrides a state's jurisdiction. Appellants have not

pointed to any federal law that would override Arizona's power to regulate hunting on its national forests.

Instead, Congress has acknowledged on several occasions the authority of the states to manage and regulate wildlife found on federal land. For example, in the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, Congress established a comprehensive framework for the management of the public lands. *See* 43 U.S.C. § 1701 (Congressional declaration of policy); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58-60 (2004) ("*SUWA*") (generally discussing FLPMA). Yet FLPMA also provides that "nothing in this Act shall be construed as . . . diminishing the responsibility and authority of the States for management of fish and resident wildlife." 43 U.S.C. §1732(b).[1] Similarly, the Multiple-Use-Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531, provides that "[n]othing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests." 16 U.S.C. § 528; *see also* 16 U.S.C. § 1133(d)(7) (Wilderness Act, providing that "[n]othing in this chapter shall be construed as affecting the jurisdiction or

---

[1] FLPMA does permit the Forest Service to "designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law." 43 U.S.C. § 1732(b). However, as discussed below, the probable outcome would be removal of California condors, exacerbating (rather than redressing) Appellants' injuries. *See infra* at § III(B).

responsibilities of the several States with respect to wildlife and fish in the national forests"). Thus, as the Supreme Court stated in *Kleppe*, "the states have broad trustee and police powers over wild animals within their jurisdictions," 426 U.S. at 545, which may be preempted only by specific federal legislation.

Although the Forest Service has interpreted its statutory authority to include the ability to protect wildlife, the Forest Service is required to cooperate with state wildlife agencies with respect to wildlife management, including hunting. For example, 36 C.F.R. § 241.2 provides:

> Officials of the Forest Service will cooperate with State game officials in the planned and orderly removal in accordance with the requirements of State laws of the crop of game, fish, fur-bearers, and other wildlife on national forest lands.

*See also* 36 C.F.R. § 241.1(a) ("Officials of the Forest Service will cooperate with State, county, and Federal officials in the enforcement of all laws and regulations for the protection of wildlife."). Of course, federal agencies must follow their own rules. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003).

Under Arizona law, all wildlife is controlled and managed by the State of Arizona, and "may be taken at such times, in such places, in such manner and with such devices as provided by law or rule of the commission." A.R.S. § 17-102. The "commission" refers to the Arizona Game and Fish Commission, which has

been delegated broad power to establish regulations and policies for the management of wildlife throughout Arizona, including rules that "prescribe the manner and methods which may be used in taking wildlife." *Id.* at 17-231(A). Under the Commission's hunting regulations, lead ammunition is generally *not* prohibited. *See* A. A. C. R12-4-303.[2]

In short, the Forest Service's authority to regulate hunting on the Kaibab National Forest is limited by the State of Arizona's traditional power to manage wildlife as well as the Forest Service's obligation to manage wildlife in cooperation with state wildlife officials. Because redress of Appellants' injuries depends on 1) the outcome of Forest Service cooperation with an independent state entity (the Commission) which has not been made a party to this suit and 2) the ability of the Forest Service to persuade the Commission to agree to a prohibition that it has declined to establish, redressability is speculative at best.

In *Defenders of Wildlife*, the plaintiffs argued that legal uncertainty regarding the court's power to bind non-party agencies "did not affect redressability . . . because the District Court itself could resolve the issue of the Secretary's authority [to bind those agencies] as a necessary part of its standing inquiry." *See* 504 U.S. at 569 (the agencies denied the Secretary's authority to

---

[2] Arizona does prohibit the use of lead ammunition in limited circumstances: "lead shot shall not be used . . . while taking ducks, geese, swans, mergansers, common moorhens, or coots . . . ." A. A. C. R12-4-304(B)(3)(d).

bind them). The Supreme Court disagreed because those agencies "were not parties to the suit, and there [was] no reason they should be obliged to honor an incidental legal determination the suit produced." *Id.* Although the agencies might cooperate with such an order, redressability was lacking because "standing is to be determined as of the commencement of suit," and it is "not likely that an agency would feel compelled to accede to the legal view of a district court expressed in a case to which it was not a party . . . ." *Id.* at 570 n.5.

Like the non-party agencies in *Defenders of Wildlife*, the State of Arizona is not a party to this suit,[3] and denies the Forest Service's authority to unilaterally ban lead ammunition in the Kaibab. *See* Memorandum in Support of the State of Arizona's Motion to Intervene for the Limited Purpose of Filing a Motion to Dismiss, CD 22, at 6-9. Because Arizona cannot be "obliged to honor an incidental legal determination" by a district court, Appellants cannot establish redressability. *See Defenders of Wildlife*, 504 U.S. at 569-71. The cases relied on by Appellants in arguing to the contrary are inapposite.

In *Alaska Ctr. for the Envt. v. Browner*, 20 F.3d 981, 984 (9th Cir. 1994), for example, this Court rejected the EPA's argument that even if it was required to

_____

[3] Although the state moved to intervene in the district court proceedings, its proposed intervention was solely for the purpose of filing a motion to dismiss, and all motions to intervene were dismissed as moot following that court's dismissal of Appellants' RCRA claim. *See* ER at 8-9.

establish total maximum daily loads ("TMDLs") for Alaskan waters under the Clean Water Act, "the actual quality of Alaskan waters [would] depend in part upon discretionary acts of the State of Alaska with respect to non-point source pollution." *Id.* at 984. The Court reasoned that "Congress and the EPA have already determined that establishing TMDLs is an effective tool for achieving water quality standards in waters impacted by non-point source pollution." *Id.* at 985.

Unlike *Browner*, where the State of Alaska could not prevent establishment of TMDLs themselves, the State of Arizona here can prevent the establishment of a lead ammunition ban in the Kaibab National Forest by virtue of its concurrent authority over hunting and other wildlife management. *See* 36 C.F.R. § 241.2. Under these circumstances, Appellants cannot meet the requirements for redressibility and therefore lack standing.

**B.     There Is No Assurance That The Alleged "Endangerment" Would Be Remedied By Restrictions On Hunting.**

Appellants' Article III standing is based on alleged injuries to its members' aesthetic, scientific and recreational interests in the California condor, a scavenger alleged to be particularly susceptible to consuming lead fragments in the remains of dead animals. *See, e.g.*, Ctr. Br. at 7-10 (discussing injuries to condors), 49-51 (citing declarations of members and stating that "this case focuses on condors because of the scientific attention they receive and the data that is available

regarding lead poisonings and mortality"); *see also* ER at 153-55 (Compl. at ¶¶ 35-42). However, condors found in northern Arizona, including the Kaibab National Forest, have been introduced by the U.S. Fish and Wildlife Service ("FWS") as a nonessential experimental population under Section 10(j) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(j). *See Establishment of a Nonessential Experimental Population of California Condors in Northern Arizona*; *Final Rule*, 61 Fed. Reg. 54044 (Oct. 16, 1996) (codified at 50 C.F.R. § 17.84(j)) ("Condor Rule"). The unique legal status of the condor population and how that population is managed impacts redressability here.

When Congress amended the ESA in 1982, it required the FWS to adopt special rules to manage experimental populations, including mechanisms (e.g., the capture and removal of animals) to control the population and reduce resource conflicts. *See Wyo. Farm Bur. Fed. v. Babbitt*, 199 F.3d 1224, 1231-32 (10th Cir. 2000). In its rulemaking authorizing reintroduction of condors, the FWS explained that Section 10(j) is designed to allow the experimental population to be managed "in a manner that will ensure that current and future land, water or air uses and activities should not be restricted . . . ." Condor Rule at 54049. The FWS also explained that its "regulations require that, to the extent practicable, a regulation promulgated under section 10(j) . . . represents an agreement between the [FWS], the affected State and Federal agencies, and persons holding any interest in land

that may be affected by the establishment of the experimental population (*see* 50 CFR § 17.81(d))." *Id.* at 54050.  With respect to condors, the FWS agreed with various county and local governments to "ensure to the maximum extent practicable that current and future land, water, or air uses within the experimental population area are not affected as a consequence of the release of California condors in northern Arizona/southern Utah . . . ." *Id.*  The agency also entered into a memorandum of understanding with various federal and state agencies, including the Kaibab National Forest, governing the management of the condor population. *Id.*

Prior to releasing any birds, the FWS evaluated "[c]urrent and future land, water [and] air uses" within the experimental population area, including "sport hunting," and concluded that these uses "should not be restricted due to the designation of the nonessential experimental population of California condors." *Id.*  The FWS specifically acknowledged that lead poisoning from hunting could result in condor deaths.  *Id.* at 54054-55; *see also* Ctr. Br. at 11 ("The Kaibab Plateau is renowned for its large-antlered mule deer … and, as a result, is a popular big game hunting destination.").  The FWS explained that notwithstanding these threats, *no restrictions* would be placed on public hunting.  Condor Rule at 54052, 54055.  Critically, the FWS stated that condors will be *removed* "to avoid conflicts with ongoing or proposed activities . . . ."  *Id.* at 54053; *see also* 50 C.F.R.

§ 17.84(j)(4)(ii) (condors will be removed "to address conflicts with ongoing or proposed activities, or . . . when removal is necessary to protect the condor . . . ."). The FWS explained that "[t]his provision . . . virtually eliminates any possibility of conflict by allowing the [FWS] or permitted cooperator to remove a condor in order to resolve potential conflict." Condor Rule at 54053. In other words, parties not before this Court, including the Arizona Game and Fish Commission (*see* Condor Rule at 54050), have expressly agreed to remove condors from the Kaibab—thereby causing the very injury Appellants seek to redress—if necessary to prevent interference with ongoing hunting activities.

Where, as here, the requested relief would actually worsen the plaintiff's position, redressability is lacking. *See, e.g., Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) ("[I]f the requested relief would worsen the plaintiff's position . . . the plaintiff lacks standing."); *Townley v. Miller*, 722 F.3d 1128, 1134-35 (9th Cir. 2013) ("Because the relief plaintiffs seek would worsen the position of voters who intend to cast ballots for NOTC, rather than redress the injury they assert, this category of plaintiffs lacks standing.").

For example, in *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), the Supreme Court held that the mother of an illegitimate child lacked standing to seek an order that a Texas statute requiring payment of child support by fathers be applied to fathers of illegitimate children. Because the statute punished violators with

incarceration, the Court reasoned that if the mother were granted the requested relief (enforcement of the statute against the father), it would result only in incarceration of the father and not in redress of her injury. *See id.* at 618 ("The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative."); *see also Friends of the Earth, Inc.*, 528 U.S. at 188 n.4 ("[T]he relief sought in *Linda R.S.*—a prosecution which, if successful, would automatically land the delinquent father in jail for a fixed term . . . would scarcely remedy the plaintiff's lack of child support payments."); *Townley*, 722 F.3d at 1134 (relying on *Friends of the Earth*'s characterization of *Linda R.S.* for the proposition that redressability is lacking where the requested relief will actually worsen the plaintiff's position).

Here, Appellants' professed injury consists of an alleged decrease in its members' opportunities to view the condor within the Kaibab National Forest. Ctr. Br. at 23.[4] This injury is allegedly caused by the Forest Service's failure "to stop the disposal of lead in the form of spent ammunition within the Kaibab" and its

---

[4] Appellants aver that other, more common avian species such as ravens and certain raptors, which may feed on dead animals, are also injured by lead ammunition. As Appellants acknowledge, however, there is insufficient data available regarding these species (as it relates to the Kaibab National Forest) to meet the "imminent and substantial endangerment" standard under RCRA Section 7002(a)(1)(B). *See* Ctr. Br. at 49-50; *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (endangerment must be serious to satisfy the "imminent and substantial endangerment" requirement).

"issuing Special Use permits for . . . activities that do not prohibit the use of lead ammunition within the Kaibab . . . ." *See* ER at 156 (Compl. at ¶¶ 45-46). Because the FWS and the Arizona Game and Fish Department have agreed to remove the condor—thereby *entirely eliminating* (rather than simply decreasing) any opportunity to view the condor in the Kaibab—before permitting any impairment of hunting privileges, Appellants' requested relief would necessarily worsen their injury. Redressability is therefore precluded.

## C. The Uncertainty Inherent In The Process By Which The Forest Service Would Regulate Hunting In The Kaibab Precludes Redressability.

Even beyond the hurdles posed by the aforementioned non-parties, redressability is precluded because of uncertainty that any "abatement order" would necessarily (or even likely) mitigate Appellants' injuries. Appellants have set forth two mechanisms through which they believe the Forest Service may act to abate an endangerment. *See* ER 150-51 (Compl. at ¶ 23). Under the first of these, the Forest Service "may issue regulations prohibiting acts or omissions . . . for . . . [p]rotection of threatened, endangered, rare, unique, or vanishing species of plants, animals, birds or fish, or special biological communities." 36 C.F.R. § 261.70(a)(4). Under the second, the Forest Service may "close or restrict the use of described areas" within its jurisdiction by applying any of certain enumerated

prohibitions, including prohibitions on "discharging a firearm" and "hunting." 36 C.F.R. §§ 261.50, 261.58.

In order to act under 36 C.F.R. § 261.70(a)(4), the Forest Service must comply with the rulemaking procedures of 5 U.S.C. § 553. *See* § 261.70(a)(4). These procedures include publication of a general notice of proposed rulemaking and an opportunity for interested persons to participate in the rulemaking process through submission of their own data and arguments. 5 U.S.C. § 553. With respect to 36 C.F.R. § 261.50, even if APA rulemaking would not be required (and even in addition to having to consult with the Arizona Game and Fish Commission, as described above) the Forest Service must satisfy itself that any order promulgated in accordance with that provision does not conflict with the Kaibab National Forest Land and Resource Management Plan. *See* 16 U.S.C. § 1604(i). Regardless of which avenue is used, the action will trigger compliance with the National Environmental Policy Act ("NEPA"), §§ 42 U.S.C. 4321-4370h. *See* 36 C.F.R. § 220.4. As the district court determined (*see* ER at 7-8), the outcome of these processes would be uncertain, and Appellants' present arguments to the contrary are unavailing.

Appellants rely heavily on this Court's decision in *Natural Resources Def. Council v. EPA* ("*NRDC*"), 542 F.3d 1235 (9th Cir. 2008) as support for the notion that uncertainty associated with the rulemaking process itself does not defeat

redressability and that they have no obligation to show that the result of that process is likely to redress their injuries. *See* Ctr. Br. at 39-42. In *NRDC*, plaintiffs argued (and this Court agreed) that the EPA has a *non-discretionary* duty to adopt effluent limitation guidelines (ELGs) and new source performance standards (NSPSs)[5] for categories of sources discharging certain pollutants once those categories have been identified as such pursuant to Section 304(m) of the Clean Water Act. *See NRDC*, 542 F.3d at 1239, 1250. The plaintiffs simply claimed that under the Act they were entitled to issuance of *some* ELGs and NSPSs—the substance of those limitations was not at issue. *See id.* at 1239. Consequently, the Court's redressability analysis was largely unconcerned with the substance of the ELGs and NSPSs. *See id.* at 1246 n. 6 (permitting use of the relaxed redressability standard typically reserved for alleged deprivations of procedural rights, which simply seek "to force an agency to engage in a procedure [and therefore] do not require the same certainty" required under the ordinary redressability inquiry).

Thus, *NRDC* is inapposite. The issue in that case was whether EPA had an obligation to adopt ELGs and NSPSs, rather than their substance. Furthermore, the relief requested was an order that the EPA adopt *some* ELGs and NSPSs, as

---

[5] ELGs and NSPSs are technology-based pollution restrictions established for certain categories of point-source polluters by the EPA in accordance with various technical standards under the CWA. *NRDC*, 542 F.3d at 1239.

opposed to a judgment directing that a particular standard be adopted.  *See id.* at 1250 ("[O]nce the EPA listed the . . . point-source category, it was required to promulgate ELGs and NSPSs.").  As a result, the "outcome" of the desired agency action was far "more certain" (as Appellants put it) than the outcome of the action requested here—a rulemaking and consultative process that must, to support standing, be likely to redress Appellants' alleged injuries by banning the use of lead ammunition in the Kaibab National Forest.[6]

Appellants' authority for the proposition that redressability exists even if the Court issues a mere "general directive" ordering compliance with RCRA is similarly inapposite.  *See Browner*, 20 F.3d at 986-87 (Unlike the discretionary Forest Service action at issue here, "the relief ordered in this case involves . . . the performance of a precise [non-discretionary] duty—to establish TMDLs for the state of Alaska—mandated by statute."[7]).

_____

[6] *Competitive Enter. Inst. v. NHTSA* and *Animal Legal Def. Fund v. Glickman* are similarly inapposite.  *See Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 117-18 (D.C. Cir. 1990) (plaintiffs merely sought *consideration* by NHTSA of whether to reduce CAFE standards and evidence indicated that after such consideration NHTSA would be willing to reduce the standards); *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 430 (D.C. Cir. 1998) (like in *NRDC*, plaintiffs alleged that the agency failed to comply with a non-discretionary statutory duty to adopt standards).

[7] Because the relief requested in *Browner* involved compliance with a non-discretionary duty to establish *some* regulatory standards rather than standards of a particular degree or magnitude, it follows that a "general directive" to ensure compliance with that non-discretionary duty would suffice.

Unlike *NRDC*, *Browner*, and other cases involving an agency's failure to comply with a non-discretionary duty, only a regulation prohibiting use of lead ammunition within the Kaibab National Forest will supply the relief Appellants require. The redressability inquiry is necessarily more exacting under these circumstances, and the uncertainty inherent in the consultative, rulemaking, and NEPA processes renders it less than "likely" that Appellants' injuries will be redressed, as the district court appropriately found. *See* ER at 7-8. Because, as the district court determined, Appellants cannot show the requisite likelihood, redressability is lacking and that court correctly dismissed this case.

**D.**  **The District Court Did Not Err In Relying On *SUWA* To Support Its Standing Determination.**

Appellants' citation to *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681 n. 10 (9th Cir. 2007) ("*NEDC*"), and *Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1096 (C.D. Cal. 2012), for the proposition that the holding of *SUWA* is limited to the APA § 706(1) context is inapt. *NEDC* did not so much limit *SUWA* to the context of APA § 706(1) as it held that *SUWA* was not applicable in the particular context of reviewing a final agency action under APA § 706(2). *See NEDC*, 477 F.3d at 680-81 (rejecting *SUWA* because § 706(2) explicitly "*gives us the equitable power*" to set aside final agency action that is arbitrary, capricious, or contrary to law) (emphasis in original). *Valentini*, which relied on *NEDC* for the proposition that *SUWA* is inapplicable in the § 706(2)

context, further illustrates the narrowness of *NEDC*'s holding.  *See Valentini*, 860

F. Supp. 2d at 1098.

Subsequent to *NEDC*, this Court explained exactly why *SUWA* is

inapplicable to § 706(2):

> We review final agency action under § 706(2)(A) to
> determine if the action is "arbitrary, capricious, an abuse
> of discretion, or otherwise not in accordance with law."
> For example, if we hold an [Environmental Impact
> Statement under NEPA] inadequate under the
> § 706(2)(A) standard because it "entirely failed to
> consider an important aspect of the problem," and direct
> the agency to redo it, we are reviewing the validity of the
> final agency action that *was* taken, not—as in *SUWA*—
> demanding that the agency take some action that it has
> *not* taken.

*Or. Natural Desert Ass'n v. Bur. of Land Mgmt.*, 625 F.3d 1092, 1119 (9th Cir.

2008) (citation omitted) (emphasis in original).  While Appellants' challenge to the

Forest Service's failure to regulate lead ammunition is made pursuant to the RCRA

citizen suit provision rather than the APA, it is nonetheless a challenge

"demanding that the agency take some action that it has *not* taken" rather than a

challenge to "the validity of [a] final agency action that *was* taken."  Therefore, as

in *SUWA*, there is no discrete, final agency action for this Court to review, which

in turn limits the nature of the relief that can be granted if Appellants were to

succeed.  As explained in *SUWA*:

> If courts were empowered to enter general orders
> compelling compliance with broad statutory mandates,

they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

542 U.S. at 66-67.  In other words, "when an agency is compelled by law to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  *Id.* at 65.

Although the plaintiffs in *SUWA* brought their cause of action under the APA, one of their claims was that BLM had violated its "nonimpairment obligation" under 43 U.S.C. § 1782(c), which requires that agency to manage certain lands "so as not to impair the suitability of such areas for preservation as wilderness."  *Id.* at 60-61.  Here, Appellants similarly assert the Forest Service has violated its "non-endangerment" obligation under 42 U.S.C. § 6972(a)(1)(B) and like the plaintiffs in *SUWA*, challenge the agency's failure to regulate third parties to comply with that obligation.  *See, e.g.,* ER 156 (Complaint, ¶45) (alleging that the Forest Service violated RCRA "by failing to use its broad authority to stop the disposal of lead"); *SUWA*, 542 U.S. at 60-61.  Although Appellants argue on appeal that they do "not claim that the Forest Service must take a specific action because of a general mandate" (*see* Ctr. Br. at 37), that is exactly what they are requesting.  *See id.* at 45 n.13 (Appellants "believe[] that prohibiting the use of

lead ammunition within the Kaibab . . . likely is the most effective way to prevent the endangerment").

In sum, given Appellants' goal of compelling the Forest Service to regulate hunting in a particular way, the district court appropriately recognized that the relief sought would improperly inject the court into the management of a national forest. Assuming, *arguendo*, that the Forest Service has caused or contributed to the "disposal" of a "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)(1)(B), the manner in which the Forest Service chooses to remedy such condition is within the agency's discretion.

**CONCLUSION**

For all of these reasons, Appellants cannot satisfy the causation and redressability requirements of Article III standing, and the district court was justified in dismissing Appellants' RCRA claim.

RESPECTFULLY SUBMITTED: February 6th, 2014.

By *s/ Norman D. James*
    Norman D. James
    Fennemore Craig, P.C.
    Attorney for National Shooting
    Sports Foundation, Inc.

*s/ Douglas S. Burdin*
    Douglas S. Burdin
    Attorney for Safari Club
    International

*s/ Michael T. Jean*
    Michael T. Jean
    Attorney for National Rifle
    Association of America

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Rule 32(a)(7)(c), Fed. R. App. P., and Circuit Rule 32-1, the foregoing Brief of Amici Curiae National Shooting Sports Foundation, Inc., Safari Club International, and National Rifle Association of America in Support of Appellee United States Forest Service is proportionately spaced, has a typeface of 14 points or more and contains 6,989 words (according to the Microsoft Word word count function).

RESPECTFULLY SUBMITTED:  February 6th, 2014.


*s/ Norman D. James*
Attorney for National Shooting Sports
Foundation, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae National Shooting Sports Foundation, Inc., Safari Club International, and National Rifle Association of America in Support of Appellee United States Forest Service with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 6th, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Norman D. James*
Attorney for National Shooting Sports
Foundation, Inc.