IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 13-16684

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*

Appellants,

v.

UNITED STATES FOREST SERVICE,

Appellee.

**APPELLANTS CENTER FOR BIOLOGICAL DIVERSITY, *et al.*'s REPLY BRIEF**

APPEAL FROM JULY 2, 2013 DECISION AND ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

Allison LaPlante (OSB 023614)
Kevin M. Cassidy (OSB 025296)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
T: (503) 768-6894 (LaPlante)
T: (781) 659-1696 (Cassidy)
F: (503) 768-6642
E: laplante@lclark.edu
E: cassidy@lclark.edu

Attorneys for Appellants

Adam Keats (CSB 191157)
Center for Biological Diversity
357 California St., Suite 600
San Francisco, CA 94104
T: (415) 436-9682 x 304
E: akeats@biologicaldiversity.org

Attorney for Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.    The Center Sufficiently Alleged Causation .................................................... 2

    A.    The Forest Service's *Failures* Can Provide the Basis for Causation ... 3

    B.    The State of Arizona Does Not Break the Chain of Causation ........... 4

    C.    Individual Hunters Do Not Break the Chain of Causation ................... 6

II.    The Center Sufficiently Alleged Redressability ............................................. 9

    A.    The Court Has the Power to Provide Redress, and Ordering the Forest Service to Abate the Ongoing Endangerment Will Effectuate Congress' Intent ................................................................................. 11

    B.    Reduction in a Known Risk Satisfies the Redressability Requirement and Redressability is Not Speculative ................................................ 13

    C.    The Government Misconstrues the Center's Burden of Proof and the Limited Facts in the Record .............................................................. 15

III.    The Center is Not Seeking To Enforce a Non-Discretionary Duty or To Remedy a Procedural Injury ...................................................................... 22

CONCLUSION ................................................................................................ 26

CERTIFICATE OF COMPLIANCE .................................................................. 27

CERTIFICATION OF SERVICE ...................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Alabama Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244 (11th Cir. 2003) ...... 14

*Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981 (9th Cir. 1994) ................... 9, 23

*Allen v. Wright,* 468 U.S. 737 (1984) .............................................. 6, 7, 8

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) ....................................... 10

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002) .................. 12

*Center for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    342 F.Supp.2d 1 (D.D.C. 2004) .................................................. 8, 9

*Clapper v. Amnesty Int'l, USA*, 133 S.Ct. 1138 (2013) ................................ 14, 15

*Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012) ................... 14

*Covington v. Jefferson Cnty.*, 358 F.3d 626 (9th Cir. 2004) ........................... 3, 5, 6

*Defenders of Wildlife v. Guiterrez*, 532 F.3d 913 (D.C. Cir. 2008) ................... 14

*Gonzales v. Gorsuch*, 688 F.2d 1263 (9th Cir. 1982) ................................. 11

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ........ 19

*Hinds Inv., L.P. v. Angioli*, 654 F.3d 846 (9th Cir. 2011) ........................... 4

*Hunt v. U.S.*, 278 U.S. 96 (1928) ................................................... 5

*Interfaith Cmty. Org. v. Honeywell Intern., Inc*,
    399 F.3d 248 (3d Cir. 2005) .................................................. 14

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) .......................................... 5

*Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010) .......................... 16

*Larson v. Valente*, 456 U.S. 228 (1982) ................................................................. 13

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ......................................... 4, 15

*Maine People's Alliance v. Mallinckrodt, Inc.,* 471 F.3d 277 (1st Cir. 2006)........ 12

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010)........................... 14

*Nat'l Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988)...................... 14

*Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004)......................................................................... 9

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)............................ 22, 26

*Natural Res. Def. Council v. EPA*, 542 F.3d 1235 (9th Cir. 2008).............. *in passim*

*Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139 (D. Or. 1998).................. 19

*Pub. Interest Research Grp. Of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*,
    913 F.2d 64 (3d Cir. 1990) ....................................................................... 7, 14

*Sierra Club v. Johnson,* No. C 08–01409 WHA, 2009 WL 482248
    (N.D. Cal. Feb. 25, 2009) ............................................................................ 25

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998)................................... 4

*United States v. Price*, 688 F.2d 204 (3d Cir. 1982)....................................... 12, 23

*Village of Elk Grove Village v. Evans*, 997 F.3d 328 (7th Cir. 1993) ................... 14

*W. Ctr. for Journalism v. Cederquist*, 235 F.3d 1153 (9th Cir. 2000)................... 16

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................... 16

**Statutes**

42 U.S.C. § 6972(a) ................................................................. 13, 24

42 U.S.C. § 6972(a)(1)(B) ........................................................ 4, 26

**Other**

61 Fed. Reg. 54,044 (Oct. 16, 1996).......................................... 22

A.R.S. § 17–234 ....................................................................... 18

A.A.C. § R12–4–304(B)(3) ...................................................... 18

# INTRODUCTION

The standing analysis in this case is simple.  Plaintiffs-Appellants Center for Biological Diversity, Sierra Club, and Grand Canyon Wildlands Council's (collectively, "the Center") members' aesthetic, recreational, professional, and commercial interests are harmed by their diminished ability to observe healthy wildlife such as iconic California condors in their natural habitat.  These injuries are fairly traceable to the Forest Service's failure to stop the poisoning and mortality of condors and other wildlife known to occur in the Kaibab National Forest due to exposure to spent lead ammunition.  The Center's members' injuries would likely be redressed by a court order requiring the Forest Service to abate the endangerment, which is the exact remedy Congress provided for in the Resource Conservation and Recovery Act ("RCRA").

Rather than framing the standing analysis correctly, the Forest Service side-steps the relevant issues before the Court.  The Forest Service focuses not on its own role in the ongoing endangerment on national forest land, but instead on the roles of the State of Arizona and individual hunters—parties whose actions the Forest Service has the undeniable authority and responsibility to control.  The Forest Service further attempts to skirt the relevant legal issues by emphasizing the risk posed to condors from spent lead ammunition in Utah.  In doing so, the Forest Service not only ignores the well-established precedent that a reduction in risk

satisfies redressability, it also attempts to create an improper factual burden at this stage in the litigation. Finally, the Forest Service incorrectly frames the Center's claim and request for relief. As a result, it brushes aside relevant Ninth Circuit and other case law, while continuing to beat the drum in support of the district court's improper reliance on the Supreme Court's holding in *SUWA*.

For the reasons stated herein and in the Center's opening brief, the Center has sufficiently alleged all of the elements of standing in this case. This Court should reverse the judgment of the district court.

## ARGUMENT

## I.     **The Center Sufficiently Alleged Causation**

As the district court properly found, the Center's injuries[1] are fairly traceable to the Forest Service's refusal to stop the disposal of lead ammunition in the Kaibab. The Forest Service has control over the use and occupancy of the Kaibab, both as the landowner and the primary regulatory authority of the forest. By failing to exercise its principal power over activities that occur in the Kaibab, the Forest Service is responsible for the spent lead ammunition deposited there, which poisons condors and other wildlife. This Circuit has already affirmed this very standing analysis in a RCRA case involving an agency's failure to take action. *See*

---

[1] The district court also properly found that the Center had sufficiently alleged injury. The Forest Service does not appear to contest that holding.

*Covington v. Jefferson Cnty.* ("*Covington*"), 358 F.3d 626 (9th Cir. 2004). The Forest Service's attempt to distinguish the case is unavailing.

The Forest Service tries to avoid its responsibility for causing the Center's injuries by shifting blame to others for a known, ongoing endangerment occurring on its property. According to the Forest Service, the actions of "numerous third parties," principally the State of Arizona and individual hunters, are the cause of the Center's injury. Brief for Federal Defendant-Appellees ("Def. Br.") at 18–19. This observation does nothing, however, to negate the Forest Service's role in causing the ongoing engenderment. The actions of any third parties in the Kaibab are *wholly dependent* on what the Forest Service permits in the Kaibab. This is *federal public land*. The Forest Service cannot pass the buck by blaming others for the consequences of actions that it has the unquestioned authority to prevent.

### A. The Forest Service's *Failures* Can Provide the Basis for Causation

Because the Forest Service has authority over and responsibility for the Kaibab, its failure to stop the harm to wildlife due to the disposal of spent lead ammunition in the Kaibab causes the Center's injuries. The Forest Service claims, however, that the Center "failed to link any of its alleged injuries…to any decision made by, or any action being undertaken by, the Forest Service." Def. Br. at 18. This argument misses the point. The Center is not required to point to a specific decision codifying the Forest Service's allowance of lead ammunition in the

Kaibab; the failure to stop the endangerment is enough to confer standing. This is consistent with long-standing Supreme Court precedent stating that inaction can be the cause of a plaintiff's injuries. *See e.g. Lujan v. Defenders of Wildlife* ("*Lujan*")*, 504 U.S. 555, 560–62 (1992) (repeatedly emphasizing that both government action and inaction can cause plaintiff's injuries).[2]

The Forest Service has the authority to control the actions of third parties on its property. The Forest Service does not, and cannot, seriously contest this authority. The Center's injuries are thus fairly traceable to the failure of the Forest Service to stop the endangerment to wildlife caused by the disposal of spent lead ammunition in the Kaibab.

B.    **The State of Arizona Does Not Break the Chain of Causation**

The Forest Service claims the State of Arizona is the cause of the Center's

---

[2] *See also* Brief of Amici Curiae National Sports Shooting Foundation, Inc., *et al*. ("NRA Br.") at 10 (claiming the Center "overstate[s] the Supreme Court's holding in *Steel Co.*" because "in laying out the standing test, [sic] does not generally discuss a defendant's omission as causing an injury.") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)). However, the *Steel Co.* Court explained that both action and *inaction* can be the cause of a plaintiff's injuries. 523 U.S. at 125. This uncontroversial concept also applies to the merits of the Center's case. RCRA requires plaintiffs to show that a defendant has contributed or is contributing to the disposal of solid waste that may present an imminent and substantial endangerment. 42 U.S.C. § 6972(a)(1)(B). The Center's theory is that the Forest Service is liable as a contributor due to its ownership, management, control of, and responsibility for the Kaibab. Under this Circuit's precedent, a party may be liable as a contributor if it "had a *measure of control* over the waste." *Hinds Inv., L.P. v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) (emphasis added). Thus, the Center need not point to an affirmative act or decision for its case on the merits, much less for standing.

injuries because "[i]t is Arizona's regulations that permit the use of lead ammunition." Def. Br. at 18. The Forest Service also attempts to distinguish *Covington* on this basis. *See id.* at 20. This argument mischaracterizes the relationship between state and federal authority in the Kaibab, misreads the *Covington* decision, and ignores the fact that both the Forest Service and the state can be causes of the Center's injuries.

The Forest Service is the cause of the Center's injuries even though it chooses to defer to Arizona in matters of hunting in the Kaibab. The Property Clause of the U.S. Constitution grants the federal government the power to pre-empt state management of wildlife on federal lands. *Kleppe v. New Mexico*, 426 U.S. 529, 539–41(1976). Therefore, "the power of the United States to [] protect its lands and property does not admit of doubt … the game laws or any other statute of the state to the contrary notwithstanding." *Hunt v. U.S.*, 278 U.S. 96, 100 (1928) (internal citations omitted).

Accordingly, even though the Forest Service *has chosen to defer* to Arizona in matters of wildlife and hunting regulation, Arizona only regulates these activities in the Kaibab under the Forest Service's oversight. The Forest Service retains ultimate authority to determine what activities are permitted in the Kaibab and ultimate responsibility for ensuring compliance with applicable laws. In *Covington*, much like the Forest Service does here, one of the agency defendants

argued it could not be the cause of the plaintiffs' injuries because "it has only regulatory oversight and gives technical guidance, but [] it is not responsible for enforcement or corrective action" at the landfill in question. 358 F.3d at 639. This Court rejected that argument, concluding that by "declin[ing] to take any … regulatory actions, such inaction, which is correctable by court order or sanction, meets the causation and redressability elements of standing." *Id*. As the Court noted, even if another agency is the "lead agency," this does not preclude an agency with regulatory authority from using tools at its disposal to abate an endangerment. *Id*. at 640. The oversight agency had the "ability and the power" to correct the environmental contamination and the fact "[t]hat [it] did not use [the] coercive tools at its ready disposal satisfies the causation requirement." *Id*. Thus the Forest Service is simply incorrect that *Covington* requires the Center to show that the Forest Service is "the agency that, in fact, regulates hunting in the Kaibab National Forest." Def. Br. at 20.

### C.    Individual Hunters Do Bot Break the Chain of Causation

In another attempt to abdicate responsibility, the Forest Service relies on *Allen v. Wright,* 468 U.S. 737 (1984), to claim that it cannot be the cause of the Center's injuries because lead poisoning in condors and other wildlife is the result of independent decisions of individual hunters in the Kaibab. Def. Br. at 18–19. The Forest Service argues that because the chain of causation involves these

hunters, "the causal chain is too weak to support standing." *Id.* at 19. But, as with the State of Arizona, the fact that hunters use lead ammunition in the Kaibab does not negate a finding that the Forest Service also causes the Center's injuries.[3] Individual hunters' decisions to use lead ammunition in the Kaibab are *wholly dependent* on the Forest Service allowing such use to occur.

The very case the Forest Service relies on aptly illustrates why the hunters do not break the chain of causation in this case. In *Allen v. Wright,* the plaintiffs brought a class action lawsuit against the Internal Revenue Service ("IRS") alleging that the IRS failed to satisfy its obligation to deny tax-exempt status to discriminatory private schools. 468 U.S. at 739–40. The plaintiffs claimed they were injured by the IRS's conduct because it interfered with desegregation of public schools. *Id.* The Supreme Court explained that the plaintiffs' injury was not fairly traceable to the IRS's conduct because the chain of causation "involve[d] numerous third parties" whose "independent decisions" may have had a significant effect on the "ability of public school students to receive a desegregated

---

[3] Tellingly, the Forest Service itself acknowledges that there can be more than one cause of the Center's injuries, as it points the finger at both the State of Arizona and hunters. And while of course there can be more than one cause of an injury, a plaintiff is not required to bring suit against every party contributing to its injury. *See, e.g., Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 n.8 (3d Cir. 1990) ("In many of these [Clean Water Act] cases, there are several parties discharging into the affected waterway. In order to obtain standing, plaintiffs need not sue every discharger in one action, since the pollution of any one may be shown to cause some part of the injury suffered.") (citations omitted).

education." *Id.* at 758-59. The Court explained that even if the IRS withdrew tax exemptions from segregated private schools, it was "entirely speculative" whether school administrators would change their policies simply because their tax-exempt status was revoked, or whether parents of private school students would send their children to public school as a result of the change in the IRS policy. *Id.* at 758. Because there was no indication that the IRS's policy impacted the independent decisions of the private school administrators and parents, the chain of causation was broken. *Id.* at 758–59.

In contrast, the chain of causation is not broken when the decisions of third parties are *dependent* on a federal policy that permits them to take particular actions. For example, in *Center for Auto Safety, Inc. v. National Highway Traffic Safety Administration*, plaintiffs challenged the National Highway Traffic Safety Agency's ("NHTSA") policy of permitting vehicle manufacturers to perform "regional recalls" of defective motor vehicles. 342 F.Supp.2d 1, 3 (D.D.C. 2004). NHTSA argued that plaintiffs lacked standing because their claims hinged on the independent choices of regulated third parties—the vehicle manufacturers. *Id.* at 10. Yet while vehicle manufacturers were responsible for issuing the regional recalls, NHTSA had set out "policy guidelines" for such recalls in a letter sent to the manufacturers. *Id.* at 7–8. The court concluded that "because the manufacturers' regional recalls are not independent of NHTSA's policy," plaintiffs

had satisfied *both* the causation and redressability prongs of standing. *Id.* at 10. So too has this Circuit concluded that third-party involvement does not break a causal chain where Congress has given the federal agency the authority to remedy the problem complained of. *Alaska Ctr. for the Env't v. Browner* ("*ACE*"), 20 F.3d 981, 984 (9th Cir. 1994) (declaring EPA's argument that the discretionary acts of a third party were the actual cause of the plaintiff's harm "untenable, because Congress has determined that the relief plaintiffs seek is the appropriate means" of achieving the plaintiffs' desired result); *see also Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 940–41 (D.C. Cir. 2004) (explaining "a party has standing to challenge government action that permits or authorizes third-party conduct" because the third party's choices are not truly independent of the government action).

Here, the decisions of the individual hunters are wholly dependent on the Forest Service's allowing the hunters to use lead ammunition. Because this is not a situation in which the defendant lacks control over third parties' actions, creating too weak a chain of causation, the Forest Service's arguments are misplaced.

## II.  The Center Sufficiently Alleged Redressability

The district court erred in dismissing the Center's case on redressability grounds. To establish redressability, "a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will*

*inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994). The Center easily meets this test. The Center's members are harmed by the ongoing endangerment to the environment and wildlife posed by spent lead ammunition in the Kaibab. This injury is caused by the Forest Service's failure to prevent the regular disposal of spent lead ammunition in the Kaibab. If the court ordered the Forest Service to abate the endangerment posed by spent lead ammunition in the Kaibab, and the Forest Service complied with such an order—as it must—the ongoing endangerment and risk to wildlife, and the harm suffered by the Center's members, would be eliminated or reduced. The redressability analysis is that simple.

Rather than framing the analysis correctly, however, the Forest Service argues that "… even if the Forest Service were to ban the use of lead ammunition in the Kaibab National Forest, the Center has failed to show that the ban would be likely to redress its alleged harm." Def. Br. at 15. This argument is based on the fact that condors—only one of the many species harmed by exposure to spent lead ammunition—"that visit the Kaibab National Forest also visit and feed outside its borders" and will therefore still be exposed to spent lead ammunition regardless of what happens within the Kaibab. *Id.* at 23. This issue is a distraction. While condors do travel beyond the Kaibab and may be exposed to lead elsewhere, this is

irrelevant to redressability. At issue in this case is the ongoing endangerment *within the Kaibab*.

It is clearly within the courts' authority to address this endangerment because Congress has provided courts this power. Pls. Br. at 29–32. What is more, plaintiffs may satisfy Article III's redressability requirement by alleging a reduction in risk. Here, a court order to abate the endangerment in the Kaibab would reduce the risk of lead exposure faced by condors and other wildlife. This in turn will address the harm suffered by the Center's members. Further, the Forest Service's reliance on Arizona lead reduction programs both misconstrues the limited facts in the record and creates an improper factual burden at the motion to dismiss stage.

A.    **The Court Has the Power to Provide Redress, and Ordering the Forest Service to Abate the Ongoing Endangerment Will Effectuate Congress' Intent**

The district court in this case clearly has the power to redress the Center's injury because Congress expressly gave it that power. To determine redressability, a court looks to whether it has "the power to right or to prevent the claimed injury." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982). Congressional intent matters: "[W]hen federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal*

*Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002).

Congress created the remedy the Center seeks by authorizing courts "to restrain any person who has contributed or who is contributing to the past or present … disposal of any solid or hazardous waste …." 42 U.S.C. § 6972(a). This citizen-suit provision was modeled after RCRA section 7003, which gives EPA authority to restrain persons contributing to imminent and substantial endangerments. *See Maine People's Alliance v. Mallinckrodt, Inc.,* 471 F.3d 277, 287 (1st Cir. 2006) (discussing relationship between RCRA sections 7002 and 7003). Congress intended RCRA section 7003 to "enhance[] the court's traditional equitable powers by authorizing the issuance of injunctions when there is *but a risk of harm*, a more lenient standard than the traditional requirement of *threatened irreparable harm*." *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982) (emphasis added) (quoting H.R.Rep.No. 96–191, 96th Cong., 1st Sess. at 45 (1979); H.R.Rep.No.93–1185, 93rd Cong., 2nd Sess.). As such, Congress "sought to invoke nothing less than the full equity powers of the federal courts in the effort to protect … the environment … from the pernicious effects of toxic wastes." *Price*, 688 F.2d at 212.

Only by ordering the Forest Service to take action necessary to abate the ongoing endangerment can the district court satisfy RCRA's purpose of protecting the environment from toxic waste such as lead. An injunction requiring the Forest

Service to abate the ongoing endangerment will eliminate or reduce the risk to wildlife posed by spent lead ammunition in the Kaibab and the threatened irreparable harm to the critically endangered condor. This in turn will redress the Center's member's injuries. Without injunctive relief, spent lead ammunition will continue to be disposed of in the Kaibab and continue to endanger the environment. "Courts should not undermine the will of Congress by either withholding relief or granting it grudgingly." *Id.* at 214. This Court should thus find that the district court had the power to redress the Center's injury.

### B. Reduction in a Known Risk Satisfies the Redressability Requirement and Redressability is Not Speculative

Redressability is satisfied if the sought-after relief is "likely to reduce the risk of the pollution causing [the plaintiff's] injury." *Natural Res. Def. Council v. EPA* ("*NRDC*"), 542 F.3d 1235, 1246 (9th Cir. 2008). An order requiring the Forest Service "to take such other action as may be necessary" to abate the ongoing endangerment redresses the Center's injuries by reducing the risk that condors and other wildlife will be exposed to lead. 42 U.S.C. § 6972(a). While such an order may not redress the Center's "every injury"—here, because some condors may be exposed to lead elsewhere—that is not what the Constitution requires. *See Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision

13

will relieve his *every* injury.").

This principle is well established. The Supreme Court, this Circuit, and other circuits have all found that reducing the risk of an injury, or partially redressing a plaintiff's injury, satisfies Article III's requirements.[4] As the Center explained in its opening brief, the Supreme Court recently made this point abundantly clear in *Monsanto Co. v. Geertson Seed Farms* when it concluded that reducing the risk of harm was sufficient for standing. 130 S. Ct. 2743, 2749–52 (2010). In line with this indisputable principle, redressability is satisfied here because a court order requiring the Forest Service to abate the endangerment will eliminate, or at least minimize, the amount of spent lead ammunition and resulting risk of exposure within the Kaibab. This remains true even if the potential for lead exposure continues elsewhere.

Rather than discussing any of the cases the Center cited in its opening brief, the Forest Service simply states, "the Center's assertion that there would be a reduction in risk is too speculative to satisfy Article III." Def. Br. at 25. To support its position the Forest Service cites two inapposite cases, *Clapper v.*

---

[4] *See*, *e.g.*, *NRDC,* 542 F.3d 1235 at 1246; *Interfaith Cmty. Org. v. Honeywell Intern., Inc.*, 399 F.3d 248, 257 (3d Cir. 2005); *Powell Duffryn*, 913 F.2d at 73; *Defenders of Wildlife v. Guiterrez*, 532 F.3d 913, 925 (D.C. Cir. 2008); *Nat'l Wildlife Federation v. Hodel*, 839 F.2d 694, 705–06 (D.C. Cir. 1988); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012); *Alabama Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1256 (11th Cir. 2003); *Village of Elk Grove Village v. Evans*, 997 F.3d 328, 329 (7th Cir. 1993).

*Amnesty International, USA,* 133 S.Ct. 1138 (2013), and *Lujan*. The Forest Service does not explain why it relies on *Clapper*, and the Center fails to see any relevance to the analysis at hand. In *Lujan*, the Supreme Court concluded that redressability was speculative, in part, because the Court could not exercise control over the foreign governments primarily responsible for the projects in question. *Lujan*, 504 U.S. at 571. That simply is not the case here. The courts, as described above, clearly have the authority to order the Forest Service to abate the ongoing endangerment in the Kaibab.

## C. The Government Misconstrues the Center's Burden of Proof and the Limited Facts in the Record

The Forest Service and its *amici* frequently suggest that the Center was required to prove that a court order requiring the Forest Service to abate the ongoing endangerment in the Kaibab will necessarily reduce the risk to condors and other wildlife caused by spent lead ammunition. Their briefing is replete with references to the Center's supposed failure to "*identif[y] [] evidence* that an outright ban on lead ammunition in the Kaibab National Forest would be likely to reduce lead levels further," Def. Br. at 24 (emphasis added), and the Center's "fail[ure] to *provide evidence* that an order requiring the Forest Service to ban lead ammunition will change the status quo on the Kaibab National Forest." Amicus Curiae Brief of State of Arizona Supporting Defendant-Appellee and Affirmance ("Ariz. Br.") at 9 (emphasis added). *See also* Def. Br. at 15, 19, 25, 26; Ariz. Br. at

6, 7, 10, 11, 12. These assertions greatly misconstrue the Center's burden in response to a motion to dismiss for want of standing.

At the motion to dismiss stage, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). Moreover, in ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the nonmoving party. *W. Ctr. for Journalism v. Cederquist*, 235 F.3d 1153, 1154 (9th Cir. 2000); *see also Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010) ("On appeal from a motion to dismiss, a plaintiff need only show that the facts alleged, if proven, would confer standing."). "Constru[ing] the complaint in favor of the complaining party," a court order requiring the Forest Service to abate the endangerment will eliminate or reduce the risk spent lead ammunition poses to condors and other wildlife in the Kaibab. *Warth*, 422 U.S. at 501. This is all the law requires at this stage in the litigation. Had the district court not erred in dismissing the Center's case on the pleadings, at the summary judgment stage—after discovery—the Center would have introduced additional facts in the form of, *inter alia*, expert testimony supporting the very conclusion the district court rejected—that eliminating the use of spent lead ammunition in the Kaibab would benefit species that live and forage there *regardless of* where those same species might otherwise be exposed to lead.

Beyond misconstruing the burden of proof, the Forest Service and *amici* also misconstrue the limited facts currently before this Court. In particular, they use selective excerpts from the Southwest Condor Recovery Team ("SCRT") 2012 report regarding only one of the many species alleged to be harmed by exposure to spent lead ammunition in the Kaibab,[5] in an attempt to manufacture speculation in the redressability analysis. *See* Def. Br. at 11, 23–24, 26; Ariz. Br. at 2–3. As an initial matter, nowhere within the report does the SCRT reach a conclusion regarding whether a court order requiring the Forest Service to abate the ongoing endangerment in the Kaibab would reduce the risk to the condor and other wildlife caused by spent lead ammunition. And while the report looks favorably upon Arizona's voluntary lead reduction program, it definitively states that it cannot conclude the voluntary program is working. ER at 73, 107. The one definitive conclusion the report does make is precisely why the Center has brought this case: "This report concludes that lead contamination is the major factor hindering the success of the [Southwest condor recovery] program. If the program is to succeed in the establishment of a self-sustaining population of condors, the sources and effects of lead contamination must be reduced or eliminated." ER at 92.

At the end of the day, it is clear that the status quo is not working; condors

---

[5] The Center's members' allege injury based on harm to other species besides condors. *See* ER at 15–16, 38 (standing declarants discussing their interests in other species vulnerable to lead poisoning in the Kaibab such as bald and golden eagles and goshawks). The Forest Service ignores these injuries.

and other wildlife continue to be harmed by the disposal of spent lead ammunition in the Kaibab. One could infer from the limited facts before the Court that the voluntary lead reduction program in Arizona is working and that the only problem remains with Utah. Alternatively, one could infer that Arizona's voluntary program is not working, or at least not working well enough. Because there are two reasonable inferences that could be drawn, the district court was required to draw the inference in the Center's favor—that is, that a voluntary compliance approach will not work. This latter inference is especially reasonable in this context because the voluntary program has been in place for 10 years and condors and other wildlife are still being exposed to and harmed by spent lead ammunition. The fact that the vast majority of restrictions on hunting are mandatory, not voluntary,[6] further supports the inference that the voluntary program will not suffice. Voluntary programs like Arizona's are difficult to verify, subject to defunding, and subject to other potential complications. In fact, Arizona's voluntary program has already experienced this reality: "[d]ue to budgetary

---

[6] As the AGFD explains on its website, "[h]unting activities are highly regulated[.]" Arizona Game and Fish Dept*., Evolution of Hunting Laws,* http://www.azgfd.gov/h_f/hunting_azLaws.shtml (last visited March 19, 2014). *See e.g.*, A.R.S. § 17–234 (authorizing the commission's ability to order open, close or alter seasons in Arizona- including National Forest Service land; establish bag and possession limits for wildlife); A.A.C. § R12–4–304(B)(3) (restricts hunting methods to take migratory game birds to (a) bow and arrow; (b) Crossbow; (c) Falconry; (d) Shotguns shooting shot, except that lead shot shall not be used or possessed while taking ducks, geese, swans, mergansers, common moorhens, or coots).

constraints, the free ammunition offer was reduced to one box per hunter from 2009–11." ER at 68.[7]

Moreover, the Forest Service and the State of Arizona place far too great an emphasis on, and draw premature factual conclusions from, the report's data that 90% of all hunters in the Kaibab are now using non-lead ammunition or packing out gut-piles. *See* Def. Br. at 10–11, 19; Ariz. Br. at 11. Even a cursory look at the report itself shows that this 90% figure is misleading. The figure is based on survey results taken of 482 "successful hunters" as they exited Jacob Lake Check Station in the Kaibab. ER at 103. The report does not explain the survey methodology or veracity. More importantly, by reporting only "successful hunts," the data do not account for "shot but not retrieved" carcasses, which pose a significant threat to condors and other wildlife if the carcasses contain lead ammunition. *See* ER at 151–152. Further, only deer and buffalo hunters are

_____

[7] The case law is well established regarding the reliability of voluntary programs under the Endangered Species Act ("ESA"), and relevant by analogy. Courts have repeatedly struck down agencies' attempts to rely on voluntary measures in lieu of regulatory programs. *See, e.g., Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1034 (9th Cir. 2011) (holding that a federal agency's reliance on voluntary measures as adequate to maintain a recovered grizzly bear population after delisting was unlawful because "[g]ood intentions are not rules of law. Unenforceable aspirational goals are not regulatory mechanisms."); *Oregon Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998) (holding voluntary state-run conservation actions could not be relied on to preclude an ESA listing because "[a]bsent some method of enforcing compliance, protection of a species can never be assured. Voluntary actions … are necessarily speculative.").

required to check in at this station, and thus the 90% participation figure does not capture the use of lead ammunition in other types of hunting.[8]  *See id.* at 69 (noting that condors have died from ingesting lead shot pellets, which are typically used to hunt small game and varmints, as well as from ingesting lead bullets, used to shoot large game).  The report notes that Arizona has increased efforts to reach out to varmint and small game hunters regarding use of non-lead ammunition, but it also states that *only approximately one-third* of those hunters surveyed indicated having taken any lead reduction efforts in the relevant time period. *Id*. at 69–70.  This Court should resist the Forest Service's invitation to draw any conclusions, especially at this stage in the litigation, about this purported 90% participation rate.

Indeed, the current and continued viability of the voluntary program is called into question by *amici* in this case.  The NRA, which advocates continued use of lead ammunition in the Kaibab, represents more than 4 million members, with nearly 100,000 in Arizona.  *See* Supp. ER at 191.  In moving to intervene in the proceedings below, the NRA submitted declarations of several of its members, all of whom continue to use lead ammunition when hunting in the Kaibab.  One of the

---

[8]  The number of deer permits issued by Arizona in 2013 also is nearly 50% fewer than the average for unit 12A over the last five years.  *Compare* Ariz. Br. at 8–9 (1,052 deer permits for 2013) *with* http://www.azgfd.gov/h_f/hunting_units_ 12a.shtml (last visited March 20, 2014) (indicating the average number of mule deer permits in the last five years to be 1,840).  This is yet another example of how the information available to the district court at this early stage in litigation only tells part of the story and cannot serve as a basis for dismissal.

NRA's members, a hunting guide in Arizona for 26 years, declared: "From my experience, I know that hunters overwhelmingly prefer to use lead ammunition for hunting ...." *Id*. at 188; *see also* NRA Br. at 4.

In addition, rather than asserting that the threat condors and other wildlife face from lead in the Kaibab is diminishing, the report notes that lead is the primary cause of mortality for condors released in northern Arizona, that condors are "lured" to the Kaibab Plateau following hunting season for the remains of hunted carcasses, that lead poisoning cases occur predominantly in the fall and winter months associated with the big-game hunting seasons, and that "[lead ammunition] fragments in animal carcasses have been the primary sources of lead contamination to condors in Arizona[.]" ER at 63–65. Furthermore, "[g]iven the relatively small size of the population, a small increase in the number of annual deaths can negatively impact the trend of the population." ER at 65. Because condors feed in groups, just one lead-contaminated carcass could poison several condors. ER at 155. The report clearly demonstrates that the overall sustainability of a wild condor population in the Kaibab, northern Arizona, and the surrounding area is greatly affected by lead poisoning and can be greatly affected by the death of just a few individual condors. ER at 65.

The above factual disputes demonstrate that there are numerous questions regarding condors and lead poisoning in the Kaibab, which will be addressed as the

litigation proceeds. Requiring the Center to carry a factual burden to "prove" anything at this stage in the ligation is improper. The Complaint and incorporated materials—when construed in the Center's favor, as they must be at the motion to dismiss stage—sufficiently allege redressability. This Court should reverse the district court's order and find that the Center has established standing at this stage in the litigation.[9]

## III. The Center is Not Seeking To Enforce a Non-Discretionary Duty or To Remedy a Procedural Injury

The Forest Service continues to mischaracterize the Center's cause of action and requested relief by creating false distinctions between the Center's case and this Circuit's precedent in *NRDC* and *ACE*. The mischaracterization of the Center's case also perpetuates the argument that the Supreme Court's ruling in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*") is relevant here, when it plainly is not. 542 U.S. 55 (2004).

---

[9] The NRA argues that the Center lacks standing because the Fish and Wildlife Service's ("FWS") Condor Rule requires FWS to remove condors from the Kaibab if a conflict arises between condors and hunting, and such removal would worsen, rather than relieve, the Center's injury. NRA Br. at 17–22. This scare tactic is based on nothing more than unfounded speculation. Moreover, while FWS noted in the Rule that it does not intend to modify or restrict hunting in the experimental population area, 61 Fed. Reg. 54044, 54055 (Oct. 16, 1996), there is nothing in the Rule that prevents *the Forest Service* from modifying or restricting hunting regulations. In addition, lead poisoning was not the central focus of the Rule. Since the Rule was issued, the impact of lead on the survival of the condor population has become a primary concern, as evidenced by the 2012 report's central focus on lead. Clearly, the reality of the situation has changed.

First, the Forest Service claims that *NRDC* and *ACE* are inapplicable because in those cases EPA possessed a non-discretionary duty to act. *See* Def. Br. at 21. But this distinction is irrelevant for purposes of constitutional standing. Regardless of whether the Forest Service has a non-discretionary duty like the duties at issue in those cases, the pertinent similarity between these cases and the present case is that statutory remedies exist that provide courts with the power to redress the alleged injury. *Compare Price*, 688 F.2d at 213–14 ("The unequivocal statutory language and [] legislative history make it clear that Congress, by enacting section 7003, intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes.") *with NRDC*, 542 F.3d at 1248 (finding redressability because Congress had already "expressed its view," via statutory language in the CWA, that promulgating specific regulations would reduce the risk of pollution causing the plaintiffs' injury), and *ACE,* 20 F.3d at 985 (finding redressability where "Congress and the EPA have already determined that establishing TMDLs is an effective tool for achieving water quality standards in water impacted by non-point source pollution.").

Moreover, the Forest Service conflates the issue of *whether* the court has the power to redress the Center's injury with the issue of *how* the Forest Service might comply with a court order requiring the Forest Service to abate the endangerment

in the Kaibab.  Courts clearly have the power to order any person—including the United States—to abate the endangerment.  *See* 42 U.S.C § 6972(a) (listing the federal government as a potential defendant in an endangerment suit).

But even if the Court looks to the manner in which the Forest Service might choose to comply with a court's order to determine whether the Center has standing, such an inquiry would not dictate a finding that the district court lacked the power to redress the Center's injury.  The fact that the defendant in this case is a federal agency places the standing analysis here in an unusual light.  While the Center is alleging a substantive injury caused by the Forest Service's contribution to an imminent and substantial endangerment in the Kaibab, the relief the Center seeks would necessarily result in agency action and ultimately, agency procedure. Thus, although the Center is alleging a substantive injury, procedural injury cases are relevant.

As the Center noted in its opening brief, this Circuit has previously drawn analogies between procedural and substantive injury cases, extending the relaxed standards of causation and redressability to non-procedural contexts where the sought-after relief involved agency procedure.  Pl. Br. at 40–46.  Specifically, in *NRDC*, this Circuit applied the relaxed standards of causation and redressability to a failure to regulate context.  542 F.3d at 1246 n. 6; Pl. Brief at 40–42.  Although *NRDC* did not involve a procedural claim, this Circuit found that "[Plaintiffs'] suit

is nevertheless similar to suits where the plaintiff claims such a procedural injury[,]" reasoning "[t]he Supreme Court has noted that suits to force an agency to engage in a procedure do not require the same certainty that the result of that procedure will have the desired effect." *NRDC*, 542 F.3d at 1246, n.6 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)).[10]

Similar to the failure to regulate context of *NRDC*, the Center's requested relief involves a court order requiring the agency to take action to abate an endangerment in the Kaibab. Such agency action would necessarily involve agency procedure, and thus "do[es] not require the same certainty that the result of that procedure will have the desired effect." *NRDC*, 542 F.3d at 1246, n. 6. The Forest Service failed to recognize this important distinction. Instead, the Forest Service focused at length on the fact that this case does not involve a procedural violation—a point the Center does not contest. Even if the Court agrees with the Forest Service that the only option would be for the Forest Service to engage in

_____

[10] At least one district court has applied this Court's reasoning in *NRDC* to a "failure to promulgate" case against EPA under CERCLA. *Sierra Club v. Johnson* ("*Sierra Club*"), No. C 08–01409 WHA, 2009 WL 482248, at *4, (N.D. Cal. Feb. 25, 2009). The *Sierra Club* court stated that, "[w]hile the Ninth Circuit in *NRDC v. EPA* did not explicitly hold that a failure to promulgate is a procedural injury, the [*NRDC*] court noted that plaintiffs' claim regarding EPA's failure to promulgate certain guidelines was similar to cases where the plaintiffs' claim is procedural and concluded that a precise showing for causation and redressability is not required in such cases." *Id.* While the plaintiffs in *Sierra Club* characterized their argument as procedural (which the court rejected), here the Center outright recognizes its claim as substantive.

rulemaking, the Center is still bringing a substantive claim. Pl. Br. at 3,12. A determination that rulemaking is required to redress the Center's injury does not somehow transform the Center's claim from substantive to procedural.

For this reason, among others, *SUWA* is wholly irrelevant to this case. *See* Pl. Br. at 35–39 (discussing the many reasons *SUWA* does not apply). This Court should reject the Forest Service's attempt to transform *SUWA* into an additional hurdle that plaintiffs must clear to establish constitutional standing.[11]

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Dated this 20th day of March, 2014.

Respectfully submitted,

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Kevin M. Cassidy (OSB 025296)
Earthrise Law Center

Attorneys for Appellants

---

[11] Likewise, the Court should reject the NRA's attempt to jump on the *SUWA* bandwagon. The NRA asserts that the Center is bringing a claim that the Forest Service has "violated its 'non-endangerment' obligation under 42 U.S.C. § 6972(a)(1)(B)," like the plaintiffs in *SUWA* attempted to enforce a "non-impairment obligation." NRA Br. at 28. The Center's complaint plainly does not allege a violation of a "non-endangerment obligation." Rather, unlike the plaintiffs in *SUWA*, the Center seeks relief under a statutorily-created cause of action to prevent the Forest Service from contributing to an endangerment in the Kaibab.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because this brief contains 6,894 words, excluding the parts of the

brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

Dated this 20th day of March, 2014.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 20, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated this 20th day of March, 2014.

/s/ *Allison LaPlante*
Allison LaPlante (OSB 023614)
Earthrise Law Center
Attorney for Appellants